**WIT CAPITAL GROUP, INC., and Wit Capital Corporation, d/b/a Wit Capital, Defendants Below, Appellants,**

v.

**Arthur E. BENNING, Sr., Barbara–Lee Benning, Arthur E. Benning, Jr., and Janessa Dabler, Plaintiffs Below, Appellees.**

No. 568, 2004.

Supreme Court of Delaware.

Submitted: Dec. 21, 2005.
Decided: Jan. 31, 2006.

---

Allen M. Terrell, Jr. and John D. Hendershot, Richards, Layton & Finger, P.A., Wilmington, DE; John N. Thomas, pro hac vice (argued), Morgan, Lewis & Bockius, L.L.P., New York City, for appellants.

Jeffrey S. Goddess, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, DE; Mark Rifkin, pro hac vice (argued), Wolf, Haldenstein, Adler, Freeman & Herz, L.L.P., New York City, for appellees.

Before STEELE, Chief Justice, JACOBS, RIDGELY, Justices.

STEELE, Chief Justice:

Defendant, Wit Capital, appealed from the Superior Court's November 30, 2004 Order certifying a class action with four subclasses, asserting breach of contract actions against Wit Capital. On June 20, 2005, while retaining jurisdiction, we remanded this case to the Superior Court for supplemental proceedings so that the trial judge could clarify her November 30 Order with a supplemental opinion. The trial judge issued a Supplemental Opinion on August 22, 2005. The bases for the trial

judge's rulings having been clarified, we decide the merits of Wit Capital's appeal.

Wit Capital provided online brokerage services, including a service offering its customers the opportunity to purchase shares in companies' IPO offerings. Plaintiffs, who are or were customers of Wit Capital, alleged that Wit Capital breached its account agreement, and its "first come, first-served" policy of allocating IPO shares, in four different respects. The Superior Court certified four sub-classes of plaintiffs with breach of contract claims, each subclass corresponding to one of the four distinct alleged breaches. Because we find that the plaintiffs cannot satisfy the "injury-in-fact" or "fact of harm" requirement under New York law, it follows that they cannot satisfy the predominance of common issues of law or fact requirement under Superior Court Rule 23(b)(3). Thus, this case cannot proceed as a class action. We, therefore, reverse the Superior Court's order certifying the four sub-classes of plaintiffs and remand the case for proceedings consistent with this opinion.

### Fact and Procedural History

Wit Capital Group, Inc. and its wholly owned subsidiary Wit Capital Corporation (collectively "Wit Capital" or "Wit") were securities broker/dealers that provided a variety of brokerage services to their retail customers. Among its services, Wit Capital gave small investors the opportunity to purchase shares in many companies' IPOs where Wit acted as an underwriter. These small investors were otherwise "excluded from the IPO market by brokerage firms that reserved IPO shares for their largest and most sophisticated customers."[1]

In most, if not all, IPOs, the demand for the IPO shares exceeds the supply. The issuer determines the total number of shares available for the offering and the shares are then allocated among the brokerage firms that participate in the underwriting. Like any other brokerage firm involved in underwriting an IPO, Wit Capital was allocated only a limited number of shares in each offering. Wit Capital, therefore, adopted a "first come, first served" allocation policy with several requirements and exceptions. One exception to the "first come, first served" allocation policy, was Wit Capital's anti-flipping rule. Wit Capital used the term "flipping" to describe a process by which an investor purchased IPO shares and sold the shares shortly after the IPO at a higher price. Under the terms of the anti-flipping rule, Wit Capital gave lower priority to a customer's request to participate in future IPOs if that customer had received shares in a previous IPO allocation and sold those shares within 60 days of purchasing them.

Wit Capital's Account Agreement, which all of its customers signed, provided that New York law would apply. Here, the parties do not dispute that New York law governs. The account agreement also set forth various requirements and procedures that customers had to follow when requesting and re-confirming request to purchase IPO shares.

On June 16, 1999, Plaintiffs, Arthur E. Benning, Sr., Barbara Lee Benning, and Arthur E. Benning, Jr., who were customers of Wit Capital, filed an initial complaint seeking declaratory relief and damages in connection with certain transactions in which Wit Capital allegedly improperly denied them allocations of IPO shares.

---

1. *Benning v. Wit Capital Group, Inc.,* 2004 WL 3030005, *1, 2004 Del.Super. Lexis 411, *4 (Del.Super.2004).

Thereafter, Wit Capital filed a Motion to Dismiss or Stay the Initial Complaint on August 13, 1999. At a hearing on November 9, 1999, the trial judge denied the motion and directed the Plaintiffs to move for class certification following Wit Capital's responses to limited class certification discovery.

The Plaintiffs filed their Motion for Class Certification on December 16, 1999. On April 14, 2000, the Plaintiffs filed an amended complaint, which added Janessa Dabler as an additional named plaintiff. The amended complaint included claims for breach of contract[2], breach of the implied covenant of good faith and fair dealing, common law fraud, negligent misrepresentation, breach of common law fiduciary duty, negligence, and violation of the Delaware Consumer Fraud Act.

On January 10, 2001, the trial judge denied the Motion for Class Certification on several grounds.[3] After denying the Motion for Class Certification, on February 15, 2001, the trial judge dismissed the action entirely because the account agreement provided for mandatory and binding arbitration of Plaintiffs' individual claims. On November 1, 2001, we reversed the denial of class certification and remanded the case to the Superior Court. In doing so, we did not address the merits of the class certification arguments. Instead, we found that the trial judge erred by failing

2. In the breach of contract claims, the plaintiffs alleged four ways in which Wit Capital breached its Account Agreement and thus failed to allocate properly IPO shares on a "first come, first-served" basis. First, the plaintiffs alleged that Wit Capital used the incorrect date for calculating its customers' account balances, which resulted in Wit Capital deeming some customers who submitted requests to participate in an IPO to be ineligible because they did not meet the minimum account balance requirement of the Account Agreement. This happened because Wit Capital allegedly incorrectly allocated shares to customers requesting to participate in IPOs on the effective date (or the trade date) of the IPO rather than the settlement date. The plaintiffs alleged that the correct date, as required by the account agreement, was the settlement date, which was three days after the trade date. Because Wit used the balances in its customers' accounts on or before the effective or trade date of the IPO instead of the balances on the settlement date, plaintiffs alleged, Wit Capital improperly rejected orders from customers whose accounts were inadequately funded by the effective date, but who could have or did fund their accounts by the settlement date.

Second, Plaintiffs alleged that Wit Capital improperly calculated its customers' minimum account balances as though the customer was required to have an all cash balance after the settlement on a proposed IPO purchase, instead of using a balance of both cash and stock, as the Account Agreement provided. Accordingly, plaintiffs alleged, there were certain customers who were denied the opportunity to participate in an IPO because they did not meet the minimum account balance requirement based on a calculation improperly excluding the value of the stocks in these customers' accounts.

Third, Plaintiffs alleged that Wit Capital did not limit the number of shares that it could allocate to any one customer if an IPO was oversubscribed, which, as plaintiffs noted, they all were. Wit Capital had a written policy that limited customers to no more than 100 or 200 shares of any particular IPO stock if it ultimately received fewer shares than its customers had ordered. Wit Capital allegedly breached this policy by allocating more than the supposed maximum number of shares to certain customers whereas otherwise qualified customers received no shares.

Finally, the Plaintiffs alleged that Wit Capital breached its "anti-flipping" policy. Again, this policy provided that, in later IPOs, Wit Capital would give preference to customers who did not sell shares they received in earlier IPOs within 60 days after the initial purchase. The Plaintiffs alleged that Wit Capital breached this policy by allocating shares to "flippers" while in the same IPO denying "non-flippers" any IPO stock.

3. *Benning v. Wit Capital Group, Inc.*, 2001 WL 38781, 2001 Del Super Lexis 7 (Del.Super.2001).

to allow the plaintiffs to conduct sufficient discovery before denying the class certification motion.[4]

On November 30, 2004, after giving the plaintiffs the opportunity to conduct additional discovery and after holding two oral arguments, another Superior Court judge issued a Memorandum Opinion and Order granting in part and denying in part the Plaintiffs' renewed Motion for Class Certification.[5] The successor trial judge held that the plaintiffs could not pursue their "holder" claims[6] as part of a class action because an award would be speculative and not based on a cognizable injury.[7] The judge also concluded that, "to the extent other allegations assert reliance as an element of any cause of action (such as fraud), those claims are not appropriate in a class action. Individual issues of justifiable reliance predominate over questions common to members of a potential class."[8] The trial judge's order did, however, certify four subclasses of qualified Wit Capital customers who had allegedly been denied IPO allocations.[9] The four subclasses that the Superior Court certified corresponded to the four ways in which Wit Capital allegedly breached its account agreement:

Subclass 1: qualified customers whose accounts may not have been adequately funded as of the effective date for each IPO, but who subsequently could have or did fund their accounts for the order in question, and were denied IPO allocations because Wit Capital determined account balances on or before the effective date, rather than the settlement date;

Subclass 2: qualified customers who had sufficient cash and stock in their accounts, but were denied IPO allocations because Wit Capital improperly calculated the minimum account balances as though the customer had to have an all cash balance;

Subclass 3: qualified customers who received no IPO shares because Wit Capital allocated more than the proper number of shares to other customers; and

Subclass 4: qualified customers who had not been identified as "flippers," but were denied IPO allocations because Wit Capital disregarded its preference policy and, as part of the same IPO, allocated stock to customers identified as "flippers."[10]

Rule 23(b)(3) requires that common questions of law or fact predominate over questions affecting only individual class members. In discussing that requirement, the trial judge noted that while, "[a] single class comprised of all customers ... harmed as a result" of the four ways in which Wit Capital allegedly breached its account agreement "would be problematic" because "[e]ach of Plaintiff's four theories of recovery involve[d] a separate factual and legal analysis ... [t]he creation of four

---

**4.** *Benning v. Wit Capital Group, Inc.,* 792 A.2d 188 (Del.2001) (order).

**5.** *Benning v. Wit Capital Group, Inc.,* 2004 WL 3030005, 2004 Del.Super. Lexis 411 (Del.Super.2004).

**6.** The plaintiffs alleged that they were induced to hold their shares for 60 days so as to not be labeled "flippers" in the belief that they would gain a higher priority in future allocations than if they were "non-flippers."

**7.** *Id.* at *7, 2004 Del.Super. Lexis 411 at *23.

**8.** *Id.* at *7, 2004 Del.Super. Lexis 411 at *23–24.

**9.** As the plaintiffs note, by negative implication "[t]he Superior Court ... declined to certify causes of action based on theories of common—law fraud, consumer fraud [and] negligence."

**10.** *Id.* at *7, 2004 Del.Super. Lexis 411 at *24–25.

sub-classes, according to the type of alleged wrongful conduct, ensure[d] that the questions of law and fact common to each sub-class [would] predominate over individual questions." [11]

We accepted Wit Capital's interlocutory appeal from the trial judge's order certifying the four subclasses on February 8, 2005. On appeal, Wit Capital argued, among other things, that the trial judge erred in finding that questions of law or fact would predominate over individual issues. In its briefs and in oral argument before this Court, Wit Capital advanced a "fact of harm" argument that any alleged breach of the Account Agreement did not cause harm on a class-wide basis and accordingly, individual issues predominated over common issues. For the first time, on May 25, 2005, in oral arguments before this Court, plaintiffs countered Wit Capital's "fact of harm" argument with the so-called "pop" theory.

In our June 20, 2005 Order reversing and remanding the Superior Court's November 30, 2004 Order certifying the four sub-classes, we concluded that the plaintiffs did not squarely respond to Wit Capital's "fact of harm" argument in the Superior Court proceeding and that the trial judge's class certification opinion did not adequately address the argument either. [12] The trial court disposed of Wit Capital's

"fact of harm" argument by ruling that dividing the class into four subclasses would automatically guarantee that class issues predominated over individual ones. We noted that in reaching this conclusion, the trial court implicitly rejected Wit Capital's "fact of harm" arguments, but did not explicitly address those arguments or explain why they lacked merit. Nor did the trial judge articulate the basis for her conclusion that dividing the class into four subclasses would obviate individual issues predominating over class issues. We concluded that the trial judge's rulings on the issues of predominance, superiority, typicality and adequacy of representation were insufficient to enable us meaningfully to review whether, given Wit Capital's claims of error, the rulings were correct. Accordingly, we reversed and remanded to enable the trial judge to conduct a supplemental class certification proceeding and to clarify her rulings in a supplemental opinion. [13]

Two months later, on August 22, 2005, the trial judge issued the supplemental opinion [14] we requested. In the portion of that opinion discussing Rule 23(b)(3)'s predominance requirement and the defendant's "fact of harm" argument, the trial judge, citing no authority, clarified her previous ruling:

> Defendants have argued that if class members had received allocations, some

---

**11.** *Id.* at *6, 2004 Del.Super. Lexis 411 at *20–21.

**12.** *Wit Capital Group, Inc. v. Benning*, Order, No. 568, 2004, C.A. No. 99C–06–157 (June 20, 2005) at 5–7, 2005 WL 3754559 at **2–3.

**13.** In oral arguments before the trial judge in the supplemental class certification proceedings, the trial judge and plaintiffs' counsel speculated about this Court's reasoning in reversing and remanding and whether in doing so whether we, too, implicitly rejected Wit Capital's "fact of harm" argument. Although we are free to affirm on grounds different

from those upon which a trial judge relies, we are more hesitant to reverse on the basis of the defendant's argument where the plaintiffs did not squarely respond to that argument before the trial judge and where the trial judge did not address the argument at all, but implicitly rejected it. As stated in our remand order, the trial court's opinion and rulings on this issue were insufficient to enable this court to conduct a meaningful review.

**14.** *Benning v. Wit Capital Group, Inc.*, 2005 WL 2249765, 2005 Del.Super. Lexis 316 (Del.Super.Ct.2005).

members may have sold their stock at a profit, but others may have continued to hold their stock, or may have sold at a loss. Thus, defendants claim that the fact of harm is inherently individual and precludes class action treatment.

For the first time, during argument before the Supreme Court, plaintiffs countered with the "pop" theory. For 13 of the 14 IPOs examined by [an expert], on the first day of public trading, the shares traded substantially above the IPO allocation price. This difference between the offering price and the first day's public trading price is referred to in the securities industry as the "pop." Plaintiffs argue that because plaintiffs were improperly denied allocations, they were injured at the time of the allocation because they lost the opportunity to purchase shares at the substantially lower IPO price.

For purposes of class certification in a breach of contract action, the fact of harm or injury should be determined as of the time of the breach. Whether or not any individual class member would have sold at a profit, held, or sold at a loss, is a measure of damages issue. Defendants consistently have argued that fact of harm and measure of damages are wholly separate issues and should not be conflated. Legal precedent cited by defendants specifically states that injury must be proven on a class-wide basis. Under the circumstances presented in this action, it is not speculative that plaintiffs affirmatively requested to participate in IPOs. If these requests are found to have been improperly denied, the damages due to individual defendants will be established according to New York law. The poten-

tial for complexity in damages calculation is not a bar to class certification. Therefore, this Court finds that common questions of law or fact predominate over any questions affecting only individual members. However, all four subclasses will be further limited to those IPOs in which stock prices rose at the time of the breach; in other words, in which stock prices rose on the first day the stock was available for public trading.[15]

Because we retained jurisdiction in our June 20, 2005 order remanding this case to the Superior Court, it is before us once again. After the parties submitted supplemental briefs, we heard oral arguments on December 21, 2005. We hold that the trial judge erred in certifying the class because individual issues predominate over common issues of law and fact and, therefore, one of the requirements of Rule 23(b)(3) for class certification is not satisfied. Our reasons for so concluding follow.

### Discussion

Delaware Superior Court Civil Rule 23 provides the requirements that must be satisfied if a case is to proceed as a class action. Under the Rule, class certification requires a two-step analysis.[16] The first step requires the Court to determine that the action satisfies all four requirements of Superior Court Rule 23(a), that: the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

---

**15.** *Id.* at **5–6, 2005 Del.Super. Lexis 316 at *16–17.

**16.** *See Nottingham Partners v. Dana,* 564 A.2d 1089, 1094 (Del.1989) (discussing Ch. Ct. R. 23).

If the Rule 23 subsection (a) requirements are satisfied, the second step is to properly fit the action within the framework provided for in subsection (b).[17] Superior Court Rule 23(b) sets forth three disjunctive requirements in addition to the requirements of subsection (a). Only one of the Rule 23(b) requirements must be satisfied to certify a class action. In this case, only the third requirement applies. Rule 23(b)(3) provides that an action may be maintained as a class action if the "Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." If any one of the requirements of Rule 23(a) or either the predominance or superiority requirement of Rule 23(b)(3) is not satisfied, the case cannot proceed as a class action. Here, we find that the predominance requirement of Rule 23(b)(3) is not satisfied. Accordingly, this case cannot proceed as a class action.

■ At this point in the litigation, the parties agree that, under New York law, in a breach of contract action, the plaintiff must prove the "fact of injury"[18] in addition to proving damages.[19] Although the distinction between the fact of injury and damages may be "ephemeral," as plaintiffs suggest, the distinction clearly exists.[20] As the Ohio Court of Appeals has noted, "Class certification cases distinguish between the *amount of damages,* the calculation of which will not ordinarily defeat class certification, and the *fact of injury* and causation, which are liability elements of a claim."[21] The Ohio Court continued, quoting a United States District Court case:

> The fact of damages is distinct from the issue of actual damages. Fact of damages pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury, and relates to the appropriate measure of individual relief. Although actual damages typically require the courts to become involved in individual calculations of damages, this has been held to be an insufficient basis for denying class certification where the common issues relevant to liability can be established on a classwide basis... Class treatment of fact of damages issues, however, presumes the ability to prove the fact of damage without becoming enmeshed in individual questions of actual damage... Where proof of fact of damages requires evidence concerning individual class members, the common questions of fact become subordinate to the individual issues, thereby rendering class certification problematic.[22]

17. *See Id.* (citation omitted).

18. We used the term "fact of harm" in our June 20, 2005 order. The defendants use the term "injury-in-fact" and the plaintiffs use "fact of injury" or "proof of injury." We use all of the terms synonymously.

19. *See Plaintiffs' Brief in Further Support of Class Certification* [Before the Superior Court], pg. 3 ("The *fact of injury,* as opposed to the measure of damages, is easy to resolve based on common facts rather than individual inquiry.")(emphasis in original); *Transcript of Oral Argument Before the Superior Court, August 18, 2005, pg. 48* where plaintiff's counsel

states: "We have consistently said that proof of injury is different than the measure of damages...."; *See Supra* Note 23.

20. *See Orthocraft, Inc. v. Sprint Spectrum,* 2002 WL 31640477, 2002 U.S. Dist. Lexis 23048 (E.D.N.Y. Nov. 16, 2002).

21. *Hoang v. E*Trade Group,* 151 Ohio App.3d 363, 369, 784 N.E.2d 151 (2003) (emphasis added).

22. *Id.* 369–370, 784 N.E.2d 151 (*quoting Martino v. McDonald's System, Inc.,* 86 F.R.D. 145, 147 (D.Ill.1980)).

The parties also agree that the failure to show that some fact of injury exists can defeat class certification while issues going only to the measure of damages cannot.[23] The defendants clearly do not agree that the plaintiffs have established the requisite fact of injury in this case. Indeed, both sides in this case claim that the other side has consistently blurred or ignored the distinction between fact of injury and the measure of damages. Thus the question we must decide on this appeal is whether the plaintiffs have alleged facts giving rise to a sufficient fact of injury common to all class members such that those common issues predominate over individual issues of liability.

■ Wit Capital has argued throughout these proceedings that the Plaintiffs cannot satisfy the fact of injury requirement, and thus, cannot satisfy Rule 23(b)(3)'s predominance requirement because "the question of whether a customer who was denied an allocation was injured in fact turns on when … and at what price … that customer would have sold those shares…." Wit claims that this determination involves an inherently individual inquiry. According to Wit, not every customer who was allegedly improperly denied an allocation was injured by that de-

nial. It is possible, Wit posits, that a customer who was denied an IPO allocation would have sold the shares for less than the issuance price had he actually received the allocation. In that case, Wit suggests that the customer who did not receive the IPO shares did not suffer any injury in fact, but actually benefited from the denial of the allocation. Wit Capital relies on *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*[24] and *Hoang v. E*Trade Group*[25] to support its arguments. In both cases, the Courts denied class certification because, among other things, the fact of injury could not be established on a class-wide basis.

*Newton* involved a putative class action, brought under § 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5, in which thousands of investors sued their broker-dealers for breaching the duty of best execution. The investors alleged that the broker/defendants executed orders at the price offered on the central National Best Bid and Offer system and failed to investigate other private online services that offered prices that were frequently more favorable to the broker's clients than the NBBO price.[26] The Third Circuit upheld the District Court's denial of class certification on the grounds that the plain-

---

**23.** See *Orthocraft,* 2002 WL 31640477 at *2, 2002 U.S. Dist. Lexis 23048 at *7 (citation omitted) ("Plaintiff is correct that the need to make individual findings of damages does not defeat class certification [citation]. The critical issue … is that the fact of injury as to each member of the class is a necessary element and would still require individual analysis."); *Gunnells v. Healthplan Servs.,* 348 F.3d 417, 429 (4th Cir.2003) ("[T]he need for individualized proof of damages alone will not defeat class certification."); *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. 65, 115 (D.N.Y. 2004) ("[T]he need for individualized damages inquiries is not enough to scuttle the class action."). In their opening brief of March 11, 2005 defendants note: "Case law … clearly distinguishes between the *amount* of damages, the calculation of which will not

necessarily defeat class certification, and the *fact* of injury and causation, both of which are liability elements of a claim." Similarly, in their answering brief of April 11, 2005 plaintiffs note: "It is well-settled that the need to perform individual calculations of damages will not defeat class certification … The determination of injury in this case, like the actual calculation of damages, is not truly individualized."

**24.** 259 F.3d 154 (3d Cir.2001).

**25.** 151 Ohio App.3d 363, 784 N.E.2d 151 (2003).

**26.** *Newton,* 259 F.3d at 169–170.

tiffs' claims required individual treatment to determine actual injury.[27]

Under Rule 10b–5, a plaintiff must establish that he suffered an economic loss as a result of the defendant's fraudulent conduct.[28] The plaintiffs in *Newton* claimed that their economic loss "would be the difference between the [NBBO] price at which their trades were executed and the 'better' price allegedly available from an alternative trading source."[29] The Third Circuit concluded that to show economic loss the plaintiffs would have to establish that a better price was available for each executed trade. If no better price was available for a particular trade, then the putative class member could not have suffered injury.[30] After holding that the District Court correctly determined that the class was not entitled to a presumption of economic loss,[31] the Third Circuit discussed the predominance requirement of Fed.R.Civ.P. 23(b)(3). The Court noted the precise distinction we discussed above between "proof of injury" (i.e., fact of injury) and the "calculation of damages."[32] In this case, because the "execution of orders at the NBBO listed price did not necessarily injure each class member", it remained

"contested whether … the investors suffered a loss … ."[33] Therefore, "[d]etermining which class members were economically harmed would require an individual analysis into each trade and its alternatives."[34] "Absent proof of classwide pecuniary loss…there can be no classwide claim for securities fraud."[35] Accordingly, the Third Circuit upheld the District Court's determination that the putative class did not satisfy the predominance requirement.[36]

In *Hoang*, the Ohio Court of Appeals relied, in part, on *Newton* to reach its result. *Hoang* involved a lawsuit against E*Trade, a company that provides online investing services to its customers including automated securities order placement and execution.[37] The putative class plaintiff alleged that E*Trade breached its account agreement by failing to provide "continuous and/or reliable trading services." She alleged that E*Trade's system experienced various interruptions and that its customers could not access their accounts on certain occasions. Therefore, the plaintiff alleged, she and other customers could not execute securities transac-

27. *Id.* at 178.

28. *Id.* at 177.

29. *Id.* at 178.

30. *Id.*

31. "In fraud-on-the-market or overcharging cases that warrant a presumption of reliance, plaintiffs satisfy their initial burden because they sustain economic loss by reason of the alleged conduct….Plaintiffs may be entitled to a presumption of economic loss only when it is clear that each class member has in fact sustained economic injury." *Id.* at 179–180 (citations omitted).

32. *Id. at* 188–189. ("Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determine the actual value of the inju-

ry)…. While obstacles to calculating damages may not preclude class certification, the putative class must first demonstrate economic loss on a common basis. As noted, the issue is not the calculation of damages but whether or not the class members have any claims at all.")

33. *Id. at* 187, 190.

34. *Id. at* 189.

35. *Id.* at 187 (quoting the District Court opinion: *In re Merrill Lynch Securities*, 191 F.R.D. 391, 396 (D.N.J.1999)).

36. *Id. at* 190.

37. 151 Ohio App.3d at 365, 784 N.E.2d 151 (2003).

tions and the execution of orders they did place were delayed. The trial judge granted the plaintiff's motion certifying a class of Ohio residents who had account agreements with E*Trade on certain dates.[38] The Court of Appeals reversed.

The Court held that although all of the plaintiff's claims arose out of the same customer agreement and a common course of conduct, the trial judge erred by ignoring "the fact that liability as to each individual plaintiff's claims cannot be established in a single adjudication. Each of the plaintiff's claims requires proof of actual injury caused by the alleged wrongdoers before liability can be established."[39] In an attempt to counter the problem of proving actual injury, the plaintiff argued that nominal damages were recoverable. The Court disagreed, noting that while nominal damages might be a substitute for the amount of damages, they could not substitute for proof of injury. The Court then explained the distinction between fact of injury and the amount of damages.[40] After citing *Newton*, the *Hoang* Court concluded that, like the plaintiffs in *Newton*:

> some of the plaintiffs have suffered damages as a result of E*Trade's system interruptions while others have not. Some E*Trade Customers may not have been trading during any of the system interruptions, in which case they were not injured and have no claims. Customers that were trading may not have suffered any losses as a result of a system interruption, in which case they have no claims.[41]

Importantly, the Court continued, "some customers who were impacted by the system interruptions may have actually benefited from the interruption, in which case they have no claims."[42] Thus, the Court concluded that class certification was inappropriate because "issues relating to liability with respect to each individual plaintiff's claims make it impossible to prove or disprove the claims of all the members of the class on a simultaneous class-wide basis...."[43]

Wit's argument implies that *Newton* is analogous to this case, because plaintiffs here, like the plaintiffs in *Newton*, were not necessarily injured as a result of being denied allocations. Wit also expressly argues that *Hoang* is analogous because there, as in the case at bar, plaintiffs were seeking to engage in securities transactions, they were unable to do so because of alleged breaches by the online brokerage firm, and they could not show that injury in fact existed on a classwide basis, because certain members of the putative class were not or may not have been injured (or may have actually benefited) as a result of the alleged breach. We agree.

In numerous briefs before this Court, Plaintiffs have offered several reasons why *Hoang* and *Newton* are distinguishable. *Newton* is distinguishable, they submit, because there the plaintiffs proposed to presume economic harm, but could not calculate a model to calculate the percentage of trades affected by the alleged wrongdoing. We disagree. The *Newton* court discussed economic injury in two separate sections of its opinion.[44] At one point in

---

38. *Id.* at 366–367, 784 N.E.2d 151.

39. *Id.* at 369, 784 N.E.2d 151.

40. *See Supra* pgs. 13–14 (quoting *Hoang*).

41. *Hoang,* 151 Ohio App.3d at 370, 784 N.E.2d 151.

42. *Id.* at 371, 784 N.E.2d 151.

43. *Id.*

44. *Newton,* 259 F.3d at 173 ("We must first address whether plaintiffs' claims are entitled to class-wide presumptions of reliance and economic loss before turning to the require-

its opinion, the Third Circuit determined that the District Court correctly held that the plaintiffs were not entitled to a rebuttable presumption of classwide injury because, unlike a fraud-on-the market or overcharging case, the alleged breach of the duty of best execution did not necessarily injure each class member.[45] At a later and distinct part of the opinion, the Third Circuit discussed whether the plaintiffs could satisfy the predominance requirement in the absence of a rebuttable presumption of economic injury, and determined that they could not.[46]

Plaintiffs' attempts to distinguish *Hoang* are equally unavailing. Plaintiffs submit that *Hoang* is distinguishable because the holding in *Hoang* was largely based (1) on an interpretation of Ohio state law; and (2) entirely on a service interruption theory so its holding is inapplicable to the theories of damages proposed by holders or class members wrongfully denied allocations in this case. Moreover, Plaintiffs argue that (3) the plaintiffs in *Hoang* urged that nom-

inal damages were available to every member of the proposed class, whether or not they could prove their harm. We disagree that *Hoang* is distinguishable on these grounds.

First, the predominance requirement under Ohio Rule 23(b)(3) is very similar, if not identical, to that in Delaware. More importantly, the court in *Hoang* relied on mostly federal precedent, including *Newton*, in reaching its result. Second, the fact that *Hoang* was based on a service interruption breach of contract theory does not render it sufficiently distinguishable, particularly where *Hoang* is cited to support the rule that each individual class member must suffer an injury in fact that can be proven on a classwide basis. Finally, the nominal damages issue is not relevant because the Ohio court specifically noted that "[a]lthough nominal damages may substitute for proof of the amount of damages in certain cases, it cannot substitute for proof of injury."[47]

---

ments for certification under *Fed.R.Civ.P.* 23(b)(3).")

**45.** See *Id.* at 178–181. ("We find no support in the case law for presuming economic injury for purposes of class certification in Rule 10b–5 claims absent indication that each plaintiff has suffered an economic loss.")

**46.** *Id.* at 187–190. ("After holding the class was not entitled to a presumption of classwide loss, the District Court found that individual questions of whether each class member sustained economic injury presented insurmountable obstacles to certification ... Examining millions of trades to ascertain whether or not there was injury, said, the court, meant that individual issues overwhelmed common questions among the class. We agree.")

**47.** *Hoang*, 151 Ohio App.3d at 369, 784 N.E.2d 151. Before adopting the "Pop" theory plaintiffs also relied upon *Gunnells v. Healthplan Servs.*, 348 F.3d 417 (4th Cir. 2003) and *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65 (S.D.N.Y.2004) to sup-

port the proposition that "class certification should not be refused because some class member may have suffered no injury." These cases do not support that proposition. In *Gunnells* the defendant argued that "the probable necessity of individual proof of some of the claimed damages by individual class members prevents Plaintiffs from meeting Rule 23's requirements. Initially, [defendant] contends that individualized damages determinations destroy commonality, typicality, and predominance." *Id. at* 427. The Court disagreed noting: "the need for individualized proof of damages alone will not defeat class certification." *Id. at* 429. *Gunnells*, thus stands only for the unremarkable proposition that the possibility that individualized inquiry into Plaintiffs' damages will be required does not defeat a class certification. Moreover, the *Gunnells* court noted the distinction between amount of liability and damages explaining: "if common questions predominate over individual questions as to liability courts generally find the predominance standard ... satisfied." *In re IPO*, is unhelpful because it involved allegations that

At the oral argument held before this Court remanded the case to the Superior Court for supplemental proceedings, plaintiffs, for the first time, countered Wit's fact of injury argument with their "pop" theory.[48] Citing no authority to support that theory, plaintiffs argued that in 13 of the 14 example IPOs in this case in which they were allegedly improperly denied allocations of shares, as soon the shares of the newly public company started trading on public markets, the shares traded at prices substantially higher than the prices at which IPO allocations were offered. The "pop" refers to the difference between the offering price and first day's public trading price. Under the pop theory, Plaintiffs argued that they were injured in fact because they were improp-

erly denied *the opportunity* to purchase something that immediately became worth more than the purchase price. As Plaintiffs characterized their argument in briefing before this Court (again without citing any authority):

> *Every* class member was harmed by being denied [the opportunity to purchase IPO shares] regardless of what happened to the price of the stock after the first day's trading and regardless of whether any particular Class member would have held onto her shares, would have sold her shares, or when she would have sold. Losing the opportunity to participate in [the] IPOs meant that all class members were worsened at least by the difference between the IPO price and the first day's trading price. (emphasis in original).[49]

defendants engaged in a comprehensive scheme to defraud investors by artificially inflating stock prices. The IPO Court specifically distinguished *Newton* noting that in *Newton* there was no resemblance to cases where economic injury naturally flowed from defendant's alleged conduct (i.e., fraud on the market cases.) In *In re IPO*, however, plaintiffs alleged a coordinated scheme that artificially inflated prices throughout the market. *Id. at* 115, n. 376.

48. The plaintiffs did not advance the "pop" theory argument before the trial judge before she granted plaintiffs' motion for class certification in her order of November 30, 2004. Nor did plaintiffs raise the argument in their initial briefs before this Court. Instead, they did so for the first time in oral argument before the panel on May 25, 2005. Our June 20, 2005 order remanding this case to the Superior Court did not specifically address whether or not the plaintiffs could raise their "pop" theory on remand. We instructed the Superior Court to address and to clarify "in a supplemental class certification proceeding and supplemental opinion," the specific arguments and issues (relating to predominance, superiority, typicality and adequacy of representation) that we found the trial judge did not adequately address. The defendants now claim that the Superior Court erroneously considered the "pop" theory on remand, and therefore improperly based her supplemental

opinion on new arguments and factual submissions, because plaintiffs raised the argument for the first time in oral arguments before this Court, and never argued it to the trial judge or in initial briefing to this Court on appeal from the November 30, 2004 order of the Superior Court. The "pop" theory, although perhaps not closely related, is sufficiently related to the plaintiffs' arguments, as we characterized them in our remand order that, "the 'fact of harm' can be established on a class-wide basis through the testimony of an expert retained to develop an analytical model ... based on the assumption that all class members would have sold their stock at the time when the market price is higher than the IPO price." Because plaintiffs' counsel apparently misunderstood defendant's "fact of harm" argument until oral argument before this Court (only then did it "dawn" on plaintiff's counsel what the defendant's argument actually was), and given the complexity of the issues, the novelty of the argument, and the arguable vagueness of our June 20, 2005 remand order, we think it is not inappropriate to consider the plaintiffs' pop theory.

49. In their *Brief in Further Support of Class Certification* before the Superior Court, plaintiffs elaborated:

> For example, the E–Toys IPO was allocated at $20 per share. When it opened for pub-

Wit responds that the "pop" price is irrelevant to any customer who did not in fact trade or intend to trade on the initial day of trading. Again, Wit argues that it is possible that a customer who was improperly denied an allocation, but would have sold at a loss had he received an allocation, suffered no injury as a result of the alleged breach of contract. Because the complaint does not allege that any class member or named plaintiff actually entered the market and purchased shares at the "pop" price, Wit argues that the "pop" theory does not cure the plaintiffs' problem of proving that each class member was injured-in-fact.

If, counterfactually, the complaint did allege that the plaintiffs actually purchased shares at the pop price (or any price higher than the prices at which the IPO shares were allocated) plaintiffs would have then been able to demonstrate injury-in-fact. To the extent a customer was improperly denied an IPO allocation and then went on the open market to purchase shares at a higher price than the initial IPO allocation price, whether or not that was the pop price, that customer would have been harmed regardless of when and at what price the customer sold his shares: his ultimate gain would have been less or his

loss greater than it would have been had he purchased the shares at the offering price. Absent any allegation that the plaintiffs actually purchased shares on the open market at a price higher than the initial allocation price, any injury they allegedly suffered could only be a lost investment opportunity. That is exactly what plaintiffs' pop theory argument boils down to: a lost opportunity.[50] We do not think this lost opportunity is sufficient to constitute injury-in-fact.

As the defendants note, "whether one is injured by a lost opportunity turns on whether the opportunity itself would have resulted in a benefit or injury." We agree. Class members who were improperly denied IPO allocations but would have eventually sold their stock for less than the IPO price were not injured by the alleged improper denial. In other words, we disagree that a lost opportunity to lose money constitutes a sufficient injury-in-fact. As in *Hoang* and *Newton,* the alleged improper denial of IPO shares did not necessarily injure all class members: here, some class members may have sold their shares for a loss had they been allocated the shares in the first place. *Hoang* might be distinguishable on the ground that, there it would have been necessary to speculate as

---

lic trading, however, the very first trade was at $78. This difference between the offering price and the first day's public trading price, ... the "pop," is present in nearly every IPO Wit offered to its customers.

Where an IPO had a "pop," every person who sought an initial allocation but did not receive one lost a valuable opportunity. A person who wanted to own E–Toys stock and received an allocation of 100 shares would own that stock at a cost basis of $2,000. A person who wanted to own E–Toys but did not receive an allocation would have to spend at least $7,800 for the same ownership interest. Whether the stock goes up, down, or sideways thereafter, and whether the investors sell, hold, or buy more stock, that $5,800 difference in

the initial cost basis will **always** disadvantage the customer who did not receive the allocation.

**50.** "Investors who received allocations could sell at any time, measuring their profits (or losses) by the difference between ... their cost bases [from the initial allocation price] and the sale price. Customers who were denied allocations lost this opportunity, however. *They could forgo investment in the company altogether,* or if they purchased in the aftermarket, would have had a much higher cost basis in the stock and thus were injured-in-fact." Plaintiffs' *Brief in Further Support of Class Certification* before the Superior Court, pg. 5. (emphasis added).

to what the plaintiffs might have bought had the system interruptions not occurred, while here, as the Superior Court judge noted, "we've taken the speculation out if it. We already know that these plaintiffs wanted to subscribe to this IPO on a date certain at a price certain."[51] We think that this distinction is one without a difference. No matter from which angle it is viewed, absent an allegation that the plaintiffs actually purchased shares on the market at a price higher than the initial IPO allocation price, the "pop" theory boils down to an argument that the plaintiffs were injured-in-fact by a lost investment opportunity. In some cases, plaintiffs lost the opportunity to lose money. Those plaintiffs were not injured in fact. "The law does not provide a recovery for inchoate claims."[52] Like the plaintiffs in *Hoang*, some plaintiffs here may have actually benefited. We, thus, disagree with the Superior Court's conclusion that "whether or not any individual class member would have sold at a profit, held, or sold at a loss, is a measure of damages issue."[53] Those class members who might have sold at loss had they been allocated the IPO shares were not injured in fact by any alleged denial of an allocation of the shares.[54]

### Conclusion

Based on the foregoing, we conclude that plaintiffs cannot establish the fact of injury common to all class members, and therefore cannot satisfy Rule 23(b)(3)'s predominance requirement. Because this case cannot go forward as a class action we **REVERSE** the Superior Court's Order certifying the four subclasses and **REMAND** for proceedings consistent with this opinion.

**51.** *Transcript of Oral Argument Before the Superior Court, August 18, 2005, pg. 86.*

**52.** *Hoang,* 151 Ohio App.3d at 371, 784 N.E.2d 151. In *Hoang,* the plaintiff also alleged that every E*Trade customer was injured during the system interruption, even if they were not trading during the interruptions simply because they could not access their accounts during those times. The Court noted the maxim quoted above, that the law does not recognize inchoate claims. Thus, a plaintiff may not recover for a breach of contract absent proof of actual economic injury.

**53.** *Benning v. Wit Capital Group, Inc,* 2005 WL 2249765, *6, 2005 Del.Super. Lexis 316, *16.

**54.** The plaintiffs cite *Aroneck v. Atkin,* 90 A.D.2d 966, 456 N.Y.S.2d 558 (N.Y.App.Div.

1982) for the proposition that under New York law damages for the breach of an agreement to buy or sell stock are measured by the difference between the sale price and the fair market value at the time of the breach. Thus, according to the plaintiffs, "the Court may determine that damages are, in fact, fully equal to the 'pop.'" We fail to see how this changes the outcome. As plaintiff's counsel conceded at oral argument before the Superior Court judge after discussing *Aroneck:* "... I will admit that this is an issue that goes to damages. There is no question that what I've just read to you addresses damages rather than fact of injury." *Transcript of Oral Argument Before the Superior Court, August 18, 2005,* pg. 52. *Aroneck* discussed a measure of damages issue and not a fact of injury or injury-in-fact issue. As such, it is irrelevant to the fact of injury requirement the plaintiffs cannot satisfy in this case.