William SCHULTZ, et al., Objectors–Below Appellants,

v.

Chuck GINSBURG, and Philadelphia Stock Exchange, Inc., Meyer S. Frucher, John F. Wallace, I. Isabelle Benton, Daniel Bigelow, Kevin J. Kennedy, Kevin Carroll, Christopher R. Carter, Michael J. Curcio, Albert S. Dandridge, III, Peter C. Erichsen, Wyche Fowler, Jr., Isaac C. Hunt, Jr., Eleanor W. Myers, Daniel B. O'Rourke, Constantine Papadakis, Charles P. Pizzi, Larry L. Pressler, Gene Sperling, William Stallkamp, Wendy S. White, Citadel Derivatives Group LLC, Merrill Lynch, Pierce, Fenner & Smith, Inc., Credit Suisse First Boston Next Fund, Inc., Citigroup Financial Products, Inc., Morgan Stanley & Co., Inc., and UBS Securities, LLC, Defendants Below.

No. 341, 2008.

Supreme Court of Delaware.

Submitted: Nov. 5, 2008.
Decided: Feb. 3, 2009.

Michael J. Maimone (argued) and Titania Mack Parker, Greenberg Traurig, LLP, Wilmington, Delaware, for appellants.

Joseph A. Rosenthal, Jessica Zeldin and Lawrence Deutsch pro hac vice (argued), Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice.

Chuck Ginsberg, a stockholder in the Philadelphia Stock Exchange (PHLX), filed a class action alleging a Charter Violation and Economic Dilution in the Court of Chancery against the PHLX, its Board, and the Strategic Investors.[1] The parties settled on the eve of trial, but several groups of PHLX shareholders objected to the settlement.

The Chancellor determined that the settlement was fair and reasonable; the objectors appealed that decision. We affirmed the Chancellor's decision.[2] Ginsberg then presented a proposed allocation plan. The Chancellor held a hearing for the class to air their concerns and competing plans. He found Ginsberg's plan to be fair, reasonable, and adequate and approved the allocation plan.

On this appeal, certain former shareholders, including William Schultz, object to the allocation plan and the settlement process. Because the Chancellor conducted an orderly and logical process in approving the allocation plan, we affirm.

### FACTS

Originally, the PHLX was a nonprofit corporation owned by its 505 seatholders. In January 2004, the PHLX converted into a publicly traded Delaware corporation. In this Demutualization, each of the original 505 seats received 100 shares of Class A Stock.[3] This restructuring created an-

---

1. The Strategic Investors are Citadel Derivatives Group, LLC; Merrill Lynch, Pierce, Fenner & Smith, Inc.; Citigroup Financial Products, Inc.; Citigroup Global Markets, Inc.; and Citigroup Derivative Markets, Inc.; Morgan Stanley & Co., Inc.; and UBS Securities, LLC.

2. *In the Matter of Philadelphia Stock Exchange, Inc.*, 945 A.2d 1123 (Del.2008) (*PHLX I*).

3. The class representative, Chuck Ginsberg, received 100 shares of Class A common stock because he was a seat holder at the time of the demutualization.

other 949,500 shares in Class B common stock. In conjunction with the Demutualization, the PHLX adopted a restated Certificate of Incorporation Article IV, which provided that no person or related persons may own more than 20% of the PHLX's outstanding shares. The Certificate defined "Related persons" as "any two or more Persons that have any agreement, arrangement or understanding (whether or not in writing) to act together for the purpose of acquiring, holding, voting or disposing of shares of Common Stock."

After the Demutualization, the PHLX board discussed selling some or all of itself to different parties. In 2005, Archipelago offered $50 million to acquire PHLX. PHLX formed a special committee to consider the offer. On April 20, 2005, on the recommendation of its special committee, the PHLX board unanimously rejected Archipelago's offer as "inferior to other alternatives available to the PHLX and as not in the best long-term interests of PHLX's shareholders."

After rejecting Archipelago's offer, the PHLX board sought alternatives to diversify the base of PHLX's investors. In June and August 2005, the PHLX board approved a series of highly dilutive transactions, which we refer to collectively as the strategic investment transactions. In those transactions, six Strategic Investors bought 45% of PHLX's equity with warrants for an additional 44.4% PHLX's equity in 2006 if PHLX accomplished certain performance criteria.[4] The first strategic investment transaction occurred on June 15, 2005 when PHLX sold some of its Class B stock to two Strategic Investors. As a result, PHLX reduced its original seatholders' control to 60.2%. The second strategic investment transaction occurred on August 16, 2005, in which PHLX sold strategic equity stakes to four other Stra-

tegic Investors, reducing the former seat holders' control by a further 10%. The Strategic Investors did not pay a control premium; their investments, however, produced $40 million in new investment in PHLX and allowed the former seat holders to retain their 50,500 Class A shares.

Using the proceeds from the strategic investment transactions, in September 2005, PHLX made a self tender offer for 16,700 of its 50,500 outstanding Class A shares at $900 per share. PHLX disclosed that the strategic investment transactions reduced PHLX's book value from $949.18 to $172.64 per share. PHLX further disclosed that if the self tender succeeded, then the book value per share would decline to $147.22. The tender offer closed in October 2005 after shareholders tendered 3,600 Class A shares.

On June 6, 2006, Chuck Ginsberg, a Class A shareholder brought this class action against PHLX, its Board, and the Strategic Investors. Ginsberg sought rescission of the strategic investment transactions or, alternatively, rescissory damages, attorneys' fees, and costs. His initial complaint asserted that the PHLX board breached its fiduciary duties and that the Strategic Investors aided and abetted those breaches. On June 9, 2006, Ginsberg sought to expedite the case and to enjoin the Strategic Investors from further exercising the warrants and diluting the Class A shareholders. The Chancellor denied Ginsberg's motion to expedite the case. Ginsberg amended his complaint in July 2006, after the Strategic Investors exercised their warrants, and included an allegation that the Board had violated the Certificate of Incorporation (the "Charter Violation").

Thereafter, the PHLX board and the Strategic Investors moved to dismiss the

---

4. The warrants would increase the Strategic Investors' total equity to 89.4% of PHLX.

complaint for failure to state a claim. The Chancellor denied the motions to dismiss because the amended complaint stated a direct claim for relief for the Charter Violation.

In March 2007, Ginsberg moved for class action certification. In May 2007, the Chancellor certified the class and determined that Ginsberg could proceed as class representative on behalf of all injured parties. The class would include all PHLX Class A common stockholders on April 20, 2005 (the date that the PHLX Board rejected Archipelago's offer) and their transferees or successors in interest through June 20, 2007 (the date that the parties reached settlement).

The Strategic Investors and the PHLX board moved for partial summary judgment, claiming that their actions were necessary to save PHLX from bankruptcy. The Chancellor denied Strategic Investor UBS's motion and deferred ruling on the remaining motions until trial. The parties then sought mediation with a vice chancellor. After mediation, the parties and the Vice Chancellor signed a Memorandum of Understanding ("MOU"), under which all claims would be settled in exchange for the Strategic Investors returning 14% of the shares they acquired in the Strategic Investments; the PHLX CEO canceling his 14% restricted stock units under the PHLX management compensation plan; PHLX agreeing to pay $17.1 million cash into the settlement fund, primarily for attorneys' fees; and PHLX guaranteeing certain protections against future stock dilution.

On June 20, 2007, the parties negotiated a definitive settlement based on the MOU. The parties asked the Chancellor to consider whether to exclude the entities owned by the individual Board members

from the class. The Chancellor modified the class to permit the entities to include partners and stockholders of those entities, but to exclude the individual PHLX Board members. On September 4, 2007, Ginsberg presented the settlement to the Chancellor for a fairness determination. Ginsberg proposed to present the allocation plan after the settlement's fairness was determined. The Chancellor accepted this format. The Chancellor's scheduling order directed notice to the class members of the settlement and the settlement hearing. Some class members objected to the settlement. The Chancellor heard those objections on October 22, 2007. At the conclusion of that hearing, the Chancellor overruled the objections, approved the settlement, and entered a Final Order and Judgment.

On October 30, 2007, Ginsberg organized a class meeting to discuss the allocation phase of the settlement. Two of the current appellants, William Schultz and Alexander Benedik, attended that meeting.

Around the same time, several groups of objecting PHLX shareholders appealed the Chancellor's approval of the bifurcated settlement. In *PHLX I*, we affirmed the Chancellor's decision to bifurcate the settlement process and to overrule the objections.[5]

After we decided *PHLX I*, Ginsberg submitted a proposed supplemental notice to the Court of Chancery containing an allocation plan and a letter to the Class explaining the allocation. The Chancellor directed distribution of the notice and materials to the class. The allocation plan distinguished between holders and nonholders of PHLX stock, and then further distinguished between the nonholders as Buyers or Sellers of PHLX stock. The allocation plan considered that nonholder a

5. *PHLX I*, 945 A.2d 1123 (Del.2008).

Buyer or Seller depending on when each nonholder owned his share during the class period. The first period for nonholders occurred between April 20, 2005 (when the PHLX board rejected the Archipelago offer) and August 16, 2005 (the date upon which the PHLX completed sales to the six Strategic Investors). The second period for nonholders occurred between August 16, 2005 and June 20, 2007 (the date the parties settled the case). The allocation plan also addressed In and Out Traders, who bought and sold shares during the class period, according to the same time demarcations.

Ginsberg compared the relative strengths of the Buyers' Charter Violation claim, based primarily on contract, to the Sellers' Economic Dilution claim, based primarily on the allegations of breaches of fiduciary duties. Ginsberg considered the Demutualization claim and the claim alleging wrongful rejection of the Archipelago offer. Ginsberg also considered the claim that the Strategic Investors aided and abetted the breach of fiduciary duty. Ginsburg assessed the time when a party owned the shares during the class period, and concluded that the Buyers' Charter Violation claim had a greater likelihood of success than the Sellers' Economic Dilution claim. Ginsberg also concluded that the aiding and abetting claim would require proof that either the Charter Violation or the Economic Dilution had occurred, and that the Demutualization claim held *de minimis* value. Based on these considerations, the plan allocated: 100% per share to the Continuous Holders; 80% per share to the First Period Buyers; 20% per share to the First Period Sellers; 60% per share to Second Period Buyers; 40% per share to Second Period Sellers; and 20% per share to In and Out Traders who

bought in the First Period and sold in the Second Period.

On July 2, 2008 after all stockholders had received notice, the Chancellor held an allocation hearing which counsel for Schultz and the Objector Sellers attended. The Chancellor heard evidence about Ginsberg's proposed allocation plan and several objecting shareholders' alternative plans.[6] After hearing and considering the evidence, the Chancellor orally announced that he would approve the allocation plan because it was substantially and procedurally fair, reasonable, adequate, and equitable. The Chancellor held that the Continuous Holders, representing 64% of the class, had the claim with the most potential for success. Upholding the proposed allocation plan, the Chancellor also opined that the Buyers' Charter Violation claim had a greater likelihood of success than the Sellers' Economic Dilution claim. Thus, the Chancellor found the allocation plan to be a rational assessment of the competing interests.

On July 8, 2008, William Schultz and other Objector Sellers appealed portions of the approved allocation plan on the basis that the Buyers did not suffer an actual wrong, and therefore, profited improperly from the allocation. The Objector Sellers challenge the Second Period allocation and the allocation to former PHLX seat holders who are class members for release of their Demutualization claim. They additionally appeal the allocation of attorneys' fees. Because the Objector Sellers do not appeal the allocation to the Continuous Holders, the Chancellor permitted Ginsberg to distribute the allocated proceeds to that shareholder group.

### STANDARD OF REVIEW

■ We review a court's approval of an

---

6. For instance, the Sellers argued that they were entitled to a 100% recovery. One Buyer claimed that the Buyers should get no less than 80%. Other objections were made.

allocation plan for abuse of discretion.[7] The Court abuses its discretion when it exceeds the bounds of reason in light of the circumstances or when it ignores the rules of law or practices in a manner that creates injustice.[8]

### ANALYSIS

The Objector Sellers contend that the Chancellor made an incorrect allocation. First they argue that although the entire class is entitled to nonmonetary relief to remedy a Charter Violation, monetary relief is available only for those class members who suffered actual damage. Objector Sellers argue that they suffered actual damage because of the Economic Dilution. Second, they argue that the Chancellor should have created subclasses to take cognizance of competing economic interests. Third, they argue that the Chancellor erred by not directing a larger allocation to them, as former seat holders, because of the Demutualization. The Objector Sellers' counsel also seeks attorneys' fees if the allocation is changed to benefit the Objectors, because their counsel would have conferred a significant benefit on their "class."

Ginsberg, through class counsel, defends the allocation plan and the Chancellor's approval. Ginsberg argues that it was appropriate to value the Charter Violation claim more than the Economic Dilution claim and to allocate more of the settlement fund to those class members having the more valuable claim.

### I. The Second Period Allocation was Orderly and Logical.

#### a. The Chancellor Did Not Abuse His Discretion By Allocating Settlement Proceeds as Equitable Relief.

 An allocation plan must be fair, reasonable, and adequate.[9] The plan does not need to compensate Class members equally to be acceptable.[10] A reasonable plan may consider the relative values of competing claims.[11] Ginsberg considered the merits and the potential trial outcome of the various shareholder constituencies. The Buyers argued that the Charter Violation claim had a better chance of success, whereas the Objector Sellers argued for the Economic Dilution claim, and complain that they did not receive a proper degree of relief. The Chancellor did not abuse his discretion by permitting Ginsberg to consider the merits of the claims when allocating portions of the fund.

As a matter of law, a Charter Violation claim transfers to a later purchaser because the injury is to the stock and not the holder.[12] Therefore, under a Charter Vio-

---

7. *Kahn v. Sullivan,* 594 A.2d 48, 59 (Del.1991) (We review the record "solely for the purpose of determining whether or not the Court of Chancery abused its discretion by the exercise of its business judgment."); *In re Cendant Corp. Litig.,* 264 F.3d 201, 219 (3rd Cir.2001), *cert. denied,* 535 U.S. 929, 122 S.Ct. 1300, 152 L.Ed.2d 212 (2002).

8. *In re MCA, Inc., S'holder Litig.,* 785 A.2d 625, 633–634 (Del.2001).

9. *See PHLX I,* 945 A.2d 1123, 1137–38 (Del. 2008).

10. *Id.* at 1140 (former stockholders can be bound by a settlement and yet receive nothing when their claim has little or no value).

11. *In re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 462 (S.D.N.Y.2004).

12. *In re Sunstates Corp. S'holder Litig.,* 2001 WL 432447, at *3 (Del.Ch.); 6 *Del. C.* § 8–303(a) (Provides that "upon delivery of a ... security to a purchaser, the purchaser acquires all rights in the security that the transferor had or had power to transfer." The phrase "all rights in the security" means rights in the security itself as opposed to personal rights).

lation claim, the Buyer would suffer the injury. Conversely, and as Ginsberg admitted, the Economic Dilution claim was personal. Thus, under an Economic Dilution claim, the claim for damage suffered would remain with the Seller and not transfer to the Buyer.

PHLX's Certificate of Incorporation is a contract between the stockholders and the corporation.[13] Violation of this contract resulted in a direct claim for the Buyers.[14] In contrast, Ginsberg predicted that the Chancellor would likely find the Economic Dilution claim to be derivative.[15] The importance of that distinction—whether a claim is direct or derivative—is that shareholders would not be entitled to a money recovery resulting from a successful derivative action.[16] Thus, if a chancellor determined the Economic Dilution claim was derivative, the Objector Sellers would not be able to recover because the corporation would receive the relief and they no longer held stock in the corporation.

Ginsberg was also concerned about the impact of the 102(b)(7) exculpatory provision in PHLX's Certificate of Incorporation on the Economic Dilution claim. The exculpatory provision would bar a money damages remedy for the Economic Dilution claim unless Ginsberg could prove that the PHLX board breached their duty of loyalty or acted in bad faith.

Ginsberg, as an unbiased Continuous Stockholder, determined that on the merits a Charter Violation claim had a better

likelihood of success than Economic Dilution claim. He therefore proposed allocating a greater percentage of the fund to the Buyers. The Chancellor found support for that conclusion and approved the allocation as the product of a rational, fair, and reasonable process. He recognized that "[r]eliance on the Charter Violation claim was indeed essential to my reasoning in denying the defendant's motion to dismiss. What's more, it has been demonstrated clearly in other actions that the Demutualization claims have little or no chance of succeeding and, thus, have limited, if any, value."

The Objector Sellers claim that they, unlike the Buyers, suffered actual damages and thus should receive monetary damages. They argue that allocating settlement proceeds is equivalent to monetary relief, and that the Buyers are not entitled to such relief because they bought into the suit.

■■ Delaware law recognizes a policy against buying a lawsuit;[17] however, that did not occur here. This action returns the class to the status quo.[18] The Objector Sellers rely on *Wit Capital* to support the view that actual damages are required in order to recover money from a settlement fund.[19] *Wit Capital*, a Rule 23(b)(3) opt out action, involved a claim for monetary damages based on a breach of contract.[20] *Wit Capital* was decided under New York law, where injury in fact is a *prima facie* requirement for a breach of contract

---

13. *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del.1991).

14. *PHLX I*, 945 A.2d at 1131.

15. *See In re Paxson Commun. Corp. S'holder Litig.*, 2001 WL 812028, at *5 (Del.Ch.). In support of that prediction, the PHLX and Strategic Investor defendants argued that in their pretrial briefs.

16. Ct. Ch. R. 23.1(b).

17. *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1169 (Del.Ch.2002).

18. *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del.Ch.).

19. *Wit Capital Group v. Benning*, 897 A.2d 172 (Del.2006).

20. *Id.*

claim.[21] This action in contrast was for equitable relief. We have already concluded that $82 million of the settlement proceeds constituted equitable relief aside from the legal fees and costs.[22] Ordering rescission or awarding rescissory damages are forms of equitable relief.[23] Rescissory damages "restore a plaintiff to the position occupied before the defendant's wrongful acts."[24]

In further support of their proposed alternative allocation plan, the Objector Sellers argue that, in footnote 34 of our previous opinion, we distinguished between class members that suffered actual damages and those that did not.[25] In the first appeal, we did not address the merits of the underlying claims or determine issues relating to allocation. Footnote 34 merely attempted to explain how the different underlying claims might affect the outcome if brought to trial, and thus, affect the value of each claim during the allocation phase of the settlement. The Chancellor could not have abused his discretion by not following our instruction because we gave no such instruction.

The Objector Sellers' "actual damages" argument misapplies the law and the facts of this case. The Chancellor did not abuse

his discretion by granting equitable relief from the settlement proceeds and permitting Ginsberg's allocation plan to give greater emphasis to the equitable relief flowing from the Charter Violation claim.

### b. The Chancellor Did Not Abuse His Discretion By Certifying the Class Without Subclasses.

■■■ "[A] decision whether or not to certify a class or divide the class into subclasses calls for the sound exercise of discretion."[26] The Objector Sellers argue that Ginsberg did not fairly and adequately represent their interests.[27] They claim that Ginsberg did not invite them to his allocation meeting, and that when they discovered the meeting, Objector Sellers Schultz and Benedik showed up without invitation. They insist that the Chancellor should have created subclasses to represent economically antagonistic groups, including the Objector Sellers.

■■■ On October 30, 2007, Ginsberg held an allocation meeting. He invited the various constituencies. Schultz and Benedik, two of the Objector Seller appellants here, attended that meeting. Their counsel did not enter an appearance in the matter until after the meeting, however;

---

21. *Wit Capital*, 897 A.2d at 180.

22. *PHLX I*, 945 A.2d 1123, 1137 (Del.2008). The complaint and settlement also seek legal relief through attorneys' fees and costs. *Id.*

23. *PHLX I*, 945 A.2d at 1137.

24. Black's Law Dictionary, 8th ed., at 419 (2004).

25. Footnote 34 states:

It is at least arguable that only the Class A shareholders who were the original PHLX seatholders, or their successors in interest, could legitimately claim to have been diluted and thus entitled to participate in the 55,257 Class A share being returned. Were that argument to prevail, then the remain-

ing class members would not be entitled to receive any of the returned shares. On the other hand, all class members would be entitled to the benefits of the corporate governance changes (the anti-dilution protections), the surrender of Mr. Frucher's restricted stock units, and the $17.1 million settlement fund to be utilized for payment of attorneys' fees and expenses. Any conflicting interests as among holders, buyers and sellers is at this point only potential, and will be found to exist, if at all, only at the allocation stage.

*PHLX I*, 945 A.2d at 1142 n. 34.

26. *Id.* at 1142.

27. A class representative must fairly and adequately represent the class. Ct. Ch. R. 23(a).

through no fault of Ginsberg. Like the other objecting class members, the Objector Sellers could have sought representation at Ginsberg's allocation meeting. Their counsel had notice of the allocation meeting: the Objectors attended the meeting and the record reflected a significant number of emails and telephone conversations about the allocation plan. Furthermore, their counsel attended the Chancellor's allocation meeting on July 2, 2008, along with counsel for the other class constituencies.

 We recognize that in this allocation process, there were competing interests but we do not find that the Chancellor abused his discretion when he rejected the subclass concept. In *PHLX I*, we wrote that "[i]f during the course of that review it appears that different shareholder groups are advancing conflicting claims, that can be remedied by the Court dividing the class into subclasses, or by other means." [28] The conflicts were between the competing claims of the Buyers and Sellers. Ginsberg had no conflict because he was a Continuous Stockholder. Though we might have decided to create subclasses when this conflict arose, we do not find that the Chancellor abused his discretion by relying on the thorough and unconflicted process of the unbiased class representative—Ginsberg.

## II. The Chancellor's Allocation to the Class Members with the Demutualization Claim Was Not an Abuse of Discretion.

 In the alternative, the Objector Sellers argue that the settlement fund

should allocate at least an equal percentage to former PHLX seat holders as the Second Period Buyers because they are both releasing their claims. They contend that the allocation stripped them of their right to appeal the Demutualization. The former seat holders released their claim in the settlement. We recognized this release in our earlier decision, where stated that, during the allocation process, the Chancellor will have to "(i) determine the value of [the Demutualization] claims for settlement purposes and then (ii) allocate an appropriate portion of the settlement proceeds to those specific class members." [29]

In accordance with our guidance, Ginsberg evaluated the Demutualization claim and allocated a portion of the proceeds to the former seat holders who had released their Demutualization claim.[30] The Chancellor agreed with Ginsberg that the Demutualization claim had *de minimis* value. After the Chancellor evaluated the claim, he approved the allocation as appropriate.[31] Accordingly, we affirm the Chancellor's discretion in allocating funds to the class members who released their Demutualization claim.

## III. The Objector Sellers' Counsel Is Not Entitled to Attorneys' Fees Because They Did Not Confer a Benefit on the Class.

 Under Delaware law, an objector to a class action settlement is not entitled to attorneys' fees unless his ef-

**28.** *PHLX I*, 945 A.2d at 1142.

**29.** *Id.* at 1148 n. 54.

**30.** As stated, the first period Sellers received 20% of the per share allocation, second period Sellers received 40% of the per share allocation, and Continuous Holders received

100% of the per share allocation. Ginsberg attributes a portion of these allocations to the release of the demutualization claims.

**31.** We note that the class members raising the Demutualization received more than a *de minimis* portion of the settlement proceeds.

forts improved the final settlement or he conferred a benefit on the class.[32] The Chancellor denied the Objector Sellers' fee request because he concluded that they conferred no benefit on the class. Ginsberg urged to the Chancellor that the Objector Sellers offered only a self-serving allocation plan. We agree. We find that the approved allocation plan was the result of an orderly and logical process independent of Objector Sellers' counsel and that the Objector Sellers' counsel conferred no benefit on the class.

## CONCLUSION

The allocation plan equitably addressed the varying degrees of injury and the relative value to the class of the claims for Charter Violation and Economic Dilution. The Chancellor did not abuse his discretion by finding that the allocation plan fairly, reasonably, adequately, and rationally served the best interests of the class as a whole. The allocation was the result of an orderly and logical process. Objector Sellers' counsel conferred no benefit on the class and are not entitled to attorneys' fees. We **AFFIRM** the Court of Chancery's judgment.

32. *In re Resorts Int'l S'holders Litig.*, 1990 WL 154154, at *4 (Del.Ch.), *aff'd* 570 A.2d 259 (Del.1990) ("[a]n attorney in a class action can be awarded attorney fees only if he achieves a benefit for the class in the litigation.").