# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

MARY A. CARROLL and BETTY C. LYNN, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

PHILIP MORRIS USA, INC., a Foreign Corporation, f/k/a PHILIP MORRIS INCORPORATED,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 03C-08-167 AML

Submitted: February 3, 2017
Decided: May 30, 2017

## OPINION

Philip M. Finestrauss, Esquire, PHILIP M. FINESTRAUSS, P.A., Wilmington, Delaware; Stephen R. Fine, Esquire, LAW OFFICES OF STEPHEN R. FINE, Manchester, New Hampshire; Finis E. Williams, III, Esquire, FINIS E. WILLIAMS, III, ESQUIRE, Concord, New Hampshire; *Attorneys for Plaintiffs*.

Donald E. Reid, Esquire, MORRIS, NICHOLS, ARSHT & TUNNEL, Wilmington, Delaware; John C. Massaro, Esquire and David E. Kouba, Esquire, ARNOLD & PORTER LLP, Washington, DC.; *Attorneys for Defendant*.

**LeGROW, J.**

A long-time smoker of "light" cigarettes seeks to hold the tobacco company that sold the cigarettes liable for economic harm allegedly suffered by the plaintiff and members of a purported class that, if certified, would comprise smokers who purchased "light" cigarettes from the defendant. Confronted with a series of decisions in other jurisdictions denying class certification for similar claims, the plaintiff attempts to distinguish this case on the basis of her allegation that, not only were the cigarettes in question not "safer" than regular cigarettes, they potentially were more harmful due to the mutagenicity of the tar consumers ingested when smoking them.

The following is only the barest of summaries: the plaintiff contends the defendant, Philip Morris USA, Inc. ("Philip Morris"), fraudulently concealed from consumers and public health agencies that the company's popular cigarettes, Marlboro Lights, "potentially" were more dangerous than full-flavored cigarettes. The plaintiff urges the Court to certify a class consisting of Delaware residents who smoked Marlboro Lights. Philip Morris contends class certification is not appropriate in this case because, among other reasons, the class is not ascertainable and individual issues predominate over those susceptible of common proof. Philip Morris also seeks summary judgment in its favor on the basis that federal law expressly preempts the plaintiff's claims. Finally, Philip Morris seeks to strike the

1

expert report and conclusions proffered by the plaintiff's expert, Dr. Marvin Goldberg.

There are two key questions in this case. First, does the plaintiff's allegation that Marlboro Lights potentially were more dangerous than full-flavored cigarettes sufficiently distinguish this case from the numerous cases concluding "lights" claims are not amenable to class certification? Second, does a federal law regulating labeling and advertising for cigarettes preempt the plaintiff's state law claims for consumer fraud? For the reasons that follow, I deny the motion for summary judgment as to preemption because the plaintiff's claims arise from a state law imposing a general duty not to deceive, not a law creating requirements or prohibitions regarding smoking and health. I also deny the motion for class certification because individual issues involving causation and fact of injury predominate over the common issues. Finally, I conclude the motion to strike is moot in light of my ruling on the motion for class certification. My reasoning follows.

## FACTUAL AND PROCEDURAL BACKGROUND

The parties vigorously dispute certain of the plaintiff's factual allegations, but none of those factual disputes are material to resolving the three motions pending before the Court.

### A. The Development of "Light" or "Low-Yield" Cigarettes

The plaintiff, Mary Carroll,[1] filed this action alleging Philip Morris violated the Delaware Consumer Fraud Act ("DCFA")[2] and unjustly enriched itself by marketing and selling its Marlboro Light cigarettes. In order to understand Ms. Carroll's claims, and the basis on which she seeks certification of the class, it is necessary to have at least a cursory understanding of the development of the market for "light" or "low-yield" cigarettes.

By the mid-to-late 1950s, concerns were beginning to rise about the health effects of smoking, particularly the ingestion of tar and nicotine. Those concerns reached a crescendo in 1964, when the United States Surgeon General publicly condemned cigarettes, announcing that the death rate among smokers was 70% higher than that among non-smokers.[3] Even before the Surgeon General's warning, Philip Morris internally had begun researching and developing a cigarette

---

[1] On November 20, 2015, Plaintiff Betty C. Lynn voluntarily was dismissed from serving as class representative due to medical reasons. D.I. 113.
[2] 6 *Del. C.* § 2513.
[3] Pl.'s Opening Br. Support Mot. Class Cert. Ex. 2.

intended to deliver less tar and nicotine while maintaining a flavor that appealed to consumers.[4]

That research led Philip Morris ultimately to brand and market "Marlboro Lights," which were introduced to consumers in 1971. According to the company's promotional plan, Marlboro Lights were to be marketed to those consumers who were "becoming increasingly aware of tar and nicotine contents in cigarettes and . . . [were] searching for [a cigarette] with low tar and nicotine content and full flavor."[5] Although advertisers were not permitted to represent to consumers that low-yield cigarettes were safer or reduced the health hazards of smoking, the parties agree that, at the time Marlboro Lights were introduced, doctors and public health advocates were advising people to quit smoking or, at a minimum, switch to a low-yield cigarette.[6]

Plaintiff contends that Philip Morris designed Marlboro Lights to test as delivering lower nicotine and tar on the "FTC Method," which was the standard testing machine the industry used to measure tar and nicotine output.[7] Guidance from the FTC, issued in 1966, permitted advertisers to make statements to

---

[4] *Id.* at. Ex. 3.
[5] *Id.* at Ex. 4 at 853.
[6] *See, e.g. Id.* at Ex. 5 at 4, 7, 9, 15, 18, 27.
[7] The machine also at times was referred to as the "Cambridge Filter Method."

consumers regarding the tar and nicotine yields of cigarettes, provided such statements were based on results of the FTC Method.[8]

**B. The Health Effects of "Light" or "Low-Yield" Cigarettes**

Philip Morris designed Marlboro Lights with an increased number of ventilation holes in the filter, thereby reducing the amount of tar and nicotine that registered on the machine during the FTC Method testing. Plaintiff alleges, with record support, that the amount of tar and nicotine delivered to consumers by a Marlboro Light cigarette often differs from the amount the FTC Method registered because of the variability in individual smokers' behavior. Put differently, Plaintiff argues that, although Marlboro Lights delivered less tar and nicotine in machine testing, the filter on a cigarette is not the exclusive factor in determining how much of those ingredients a smoker actually ingests. There is substantial evidence, which Philip Morris does not dispute, that a consumer can modify, or "compensate" for, a low-yield cigarette in various ways, including covering ventilation holes, inhaling more deeply, or smoking more cigarettes.[9] This compensation may deliver to the consumer a different level of tar and nicotine than the FTC Method indicated.

Long-term studies of smokers using "light" or "low-yield" cigarettes, including investigations into consumers' compensatory smoking behavior, led the

---

[8] Pl.'s Opening Br. Support Mot. Class Cert. Ex. 12 at 1.
[9] *See id.* at Exs. 10, 11.

United States Department of Health and Human Services to issue its "Smoking and Tobacco Control Monograph 13" regarding the "Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine."[10] The report concluded, among other things, that: "Measurements of tar and nicotine yields using the FTC [M]ethod do not offer smokers meaningful information on the amount of tar and nicotine they will receive from a cigarette."[11] Consistent with those findings, in 2008 the FTC rescinded its 1966 guidance permitting companies to market cigarettes as "light" or "low-yield" based on the FTC Method. The FTC's guidance precluded companies from including in advertisements any implication that tar or nicotine yields for a cigarette were based on a testing method the FTC endorsed.[12]

Plaintiff also contends that, contrary to the suggestion that Marlboro Lights are less dangerous than full-flavored cigarettes, Marlboro Lights' ventilation system actually increased the potential toxicity of the cigarette, making Marlboro Lights potentially more mutagenic than regular cigarettes.[13] Plaintiff asserts that

---

[10] *Id.* at Ex. 11.

[11] *Id.* at Ex. 11 at 10.

[12] *Id.* at Ex. 12 at 16-17.

[13] *Id.* at 12-19 & Exs. 18-20, 23. Much of this argument relies upon testimony offered by a former Phillip Morris employee, Dr. William Farone, who was the Director of Applied Research for Phillip Morris USA, Inc. Dr. Farone testified in an Illinois state court action against Phillip Morris to the effect that the company knew that "when you dilute a cigarette . . . you would increase its relative toxicity." This Court previously ruled that, although Dr. Farone is unwilling to testify as an expert in this case, his previous testimony is admissible under D.R.E. 804. *See*

6

Philip Morris knew Marlboro Lights were "potentially more dangerous" than full-flavored cigarettes, but concealed this knowledge for decades from both consumers and public health agencies. Philip Morris vigorously contests this contention, but that factual dispute presently is not before the Court. For purposes of the pending motions, I will assume that Marlboro Lights potentially were more dangerous than full-flavored cigarettes due to the mutagenicity of the tar. Plaintiff also concedes, however, that Marlboro Lights were not more dangerous to all smokers because that question ultimately depends on the amount and type of tar ingested.[14] Thus, Plaintiff uses the phrase "potentially more dangerous."

This is the heart of Plaintiff's case, at least as she frames it for purposes of the pending motions: the purported class suffered an economic injury by purchasing Marlboro Lights, a brand of cigarette they believed was less dangerous but that actually potentially was more dangerous than a full-flavored cigarette brand, and consumers made that purchase because Philip Morris fraudulently concealed the facts regarding the potential increased risk Marlboro Lights posed.

## C. The Development of Federal Labeling Requirements

According to Philip Morris, Plaintiff's fraudulent concealment theory must be considered within the framework of federal law regarding cigarette labeling and

---

*Holmes v. Philip Morris USA, Inc.*, 03C-08-167 JTV (Del. Super. Jan. 2, 2014) (ORDER); D.I. 55.
[14] Shields Dep. 123, 243.

advertising. The warnings cigarette companies are required to give about their product, and the advertisements they are permitted to publish, became a matter of federal regulation in the mid-1960's, shortly before Marlboro Lights were introduced to the market. The Federal Cigarette Labeling and Advertising Act (the "Labeling Act")[15] established "a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health."[16] The Labeling Act was intended to both adequately inform the public about "adverse health effects of cigarette[s]" and protect commerce and the economy from "diverse, nonuniform, and confusing cigarette labeling and advertising regulations."[17]

The Labeling Act expressly included a preemption provision. Section 5(b) of the Labeling Act pertinently provides "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter."[18]

---

[15] 15 U.S.C. §§ 1331-1341 (1965) (amended 1984).

[16] *Id.* § 1331.

[17] *Id.* § 1331(1)-(2).

[18] *Id.* § 1334(b). This section of the Labeling Act frequently is referred to by the United States Supreme Court and other federal courts as "Section 5(b)." I follow that custom for clarity and consistency.

## D. Dr. Goldberg's Report and Smokers' Brand Decisions

In addition to the factual dispute regarding Marlboro Lights' potential increased risk and Philip Morris's alleged concealment of that risk, causation also will be an important factual issue at trial, specifically whether the members of the purported class would not have purchased Marlboro Lights but for that fraudulent concealment. Plaintiff asserts that causation may be inferred in this case based on the logical inference that, all things being equal, no person knowingly would purchase a cigarette that was more dangerous. From that premise, Plaintiff argues that, had Philip Morris not concealed from consumers and public health agencies its purported knowledge that Marlboro Lights potentially were more dangerous than full-flavored cigarettes, Marlboro Lights never would have been marketed for sale. In support of her causation argument, Plaintiff offers the expert report of Marvin E. Goldberg, Ph.D, whom Philip Morris has moved to strike as an expert in this case.

Dr. Goldberg's report examines the development of the market for low-yield, high-filtration cigarettes and offers his expert opinion that, "had Philip Morris not concealed that Marlboro Lights are potentially more dangerous than regular cigarettes, it most probably would have never attempted to market Marlboro Lights at all, and certainly would not have marketed Marlboro Lights as

a safer cigarette, but it did."[19] Dr. Goldberg explores data and research regarding the reasons for smokers' brand and cigarette-type decisions and concludes that smokers chose to smoke low-yield cigarettes for health reasons, even if they later justified those decisions for other reasons, such as taste.[20]

Philip Morris, on the other hand, offers evidence it contends precludes a class-wide inference, specifically evidence that individual consumers' reasons for choosing a particular brand and type of cigarette vary widely. For example, Philip Morris cites testimony given by individual smokers who listed their reasons for choosing Marlboro Lights, many of which had nothing to do with the cigarette's low-yield or a belief that it was "safer."[21] Philip Morris also relies on testimony of several smokers who began smoking Marlboro Lights despite believing they potentially were more dangerous than full-flavored cigarettes, along with others who continued smoking Marlboro Lights after filing suit against Philip Morris on the basis that Marlboro Lights potentially were more dangerous than Marlboro Reds or similar types of cigarettes.[22] Furthermore, Philip Morris relies on a number of surveys conducted in the last 40 years, all of which indicate that less than half of smokers chose to smoke low-yield cigarettes because they believed

---

[19] Goldberg Rep. 24.
[20] *Id.* at 10-24.
[21] *See* Def.'s Opp'n Mot. Class Cert. 17 (citing Ex. 48 at 27, 30, 61; Ex. 49 at 54-56; Ex. 50).
[22] *See* Def.'s Opp'n Mot. Class Cert. 16-17 n.13 (citing Exs. 48, 49, 51).

them to be less harmful.[23] Finally, Philip Morris points out that the market for Marlboro Reds did not decline substantially after low-yield cigarettes were introduced, notwithstanding Plaintiff's argument that for many decades smokers were led to believe that full-flavored cigarettes were more dangerous than low-yield cigarettes.

### E. The Proposed Class Definition(s)

Plaintiff's proposed class definition evolved in response to arguments Philip Morris raised over the course of extensive[24] briefing. Plaintiff now offers two alternative definitions of the class. In her opening brief, Plaintiff offered the following proposed definition of the class (the "Consumer Class Definition"):

> All residents of Delaware who purchased Marlboro Lights cigarettes in the State of Delaware for personal consumption during the Class Period . . . . The class period commences on the first date that the defendants [sic] placed their Marlboro Lights cigarettes into the stream of commerce in Delaware, and runs until the date on which the Court certifies this suit as a class action. Not included within the Class definition are individuals who are directors and officers of the Defendants [sic] or their affiliates. Also[] excluded is any trial judge who may preside over this action.[25]

---

[23] *See* Def.'s Opp'n Mot. Class Cert. 18 (citing Ex. 61 (*A Study of Smokers' Habits & Attitudes with Special Emphasis on Low Tar Cigarettes,* The Roper Organization Inc., May 1976); Ex. 62 (*Teenage Attitudes & Practices Survey, Public Use Data Tape,* 1993); Ex. 63 (Declaration of Expert Report of David W. Stewart, Ph.D. ¶¶ 36-39)).

[24] The parties submitted five briefs on the issue of class certification, along with several letters providing "supplemental authority" on that issue.

[25] Pl.'s Opening Br. Support Mot. Class Cert. 2-3; Pl.'s Reply Br. Support Mot. Class Cert. 34-35. Plaintiff first proposed a class definition expressly excluding individuals with personal injury claims from smoking. In response to claim preclusion issues Phillip Morris raised, Plaintiff removed that personal injury exclusion from the proposed Consumer Class Definition.

11

In response to arguments Philip Morris raised that residents purporting to qualify under the Consumer Class Definition would need to offer individual proof of their membership in the class, Plaintiff offered a proposed alternative definition, which was based on Philip Morris's Marlboro Miles Program (the "Miles Program"), an incentive-based promotional campaign that allowed consumers to collect "Miles" that were printed on Marlboro cigarette packaging.[26] Those Miles could be exchanged for merchandise.[27] The company operated that program between 1992 and 2006.[28] A consumer redeeming Miles was required to fill out a form identifying the consumer's "regular" brand of cigarette. The Miles themselves also were color-coded based on the type of Marlboro package from which they originated. Although Philip Morris shredded the paper "Miles" once they were redeemed for merchandise, the company maintained its "Adult Tobacco Consumer Database" of individuals who redeemed Miles when the program was active. That database includes the tobacco consumer's mailing address and the brand (if any) the consumer identified as their current or preferred brand.[29]

Plaintiff therefore contends that, even if the Consumer Class Definition fails because it would require individual proofs by each person claiming membership in

---

[26] Pl.'s Reply Br. Support Mot. Class Cert. Ex. 59.
[27] *Id.* at Ex. 58.
[28] Pl.'s Am. Sur-Sur Reply Br. Support Alt. Class Definition 5 n.4.
[29] Pl.'s Sur-Sur Reply Br. Support Alt. Class Definition Ex. 1.

the class, the following alternative class definition (the "Marlboro Miles Class Definition") resolves that issue:[30]

> All Delaware residents who purchased for personal consumption Marlboro Lights cigarettes in the State of Delaware who are identified in defendant's Adult Tobacco Consumer Database as having a Delaware address when ordering Marlboro Miles ("Miles") merchandise and who reported smoking Marlboro Lights during the Miles program and prior to or at the time of ordering Miles merchandise.
>
> The class period commences on the first date that defendant placed its Marlboro Lights cigarettes into the stream of commerce in Delaware which had imprinted on the packages of the Marlboro Lights cigarettes Marlboro Miles Program proof of purchase miles, and runs until the latest date on which the defendant or its designated agent received order forms with Marlboro Miles proof of purchase miles to obtain merchandise to be shipped to a recipient with a Delaware address. Not included within the Class definition are individuals who are directors and officers of the defendant or their affiliates. Also[] excluded is any trial judge who may preside over this action.[31]

## ANALYSIS

There are three motions presently pending before the Court: (1) Philip Morris's Motion for Summary Judgment Based on Federal Preemption, (2) Plaintiff's Motion for Class Certification, and (3) Philip Morris's Motion to Strike Dr. Goldberg's Expert Report. I address each motion below.

### I. Philip Morris's Motion for Summary Judgment

---

[30] The Marlboro Miles Class Definition set forth here is a revised alternative class definition; Plaintiff first proposed a class definition based on the Marlboro Miles Program in her Reply Brief in Support of her Motion for Class Certification and then revised that definition in her Sur-Sur Reply Brief based on additional discovery about the program received from Phillip Morris. *See* Pl.'s Reply Br. 48-49; Pl.'s Sur-Sur Reply Br. Support Alt. Class Definition 4-5.

[31] Pl.'s Sur-Sur Reply Br. Support Alt. Class Definition 4-5.

Philip Morris argues it is entitled to summary judgment in this action because Plaintiff's claims are preempted by the Labeling Act, specifically the language in Section 5(b) that prohibits any State law that imposes a "requirement or prohibition based on smoking and health . . . with respect to the advertising or promotion of any cigarettes . . . ." The parties' contentions do not implicate any disputed factual issues, but instead require the Court to determine the scope of preemption under Section 5(b).

## A. The Parties' Contentions

Philip Morris initially raised federal preemption in this case in 2006, which Plaintiff resisted on the basis that her claims were not grounded, as Philip Morris contended, on concealment or a failure to warn, but rather on fraudulent misrepresentations Philip Morris made regarding Marlboro Lights. Philip Morris's motion was stayed pending resolution of the United States Supreme Court's decision in *Altria Group, Inc. v. Good*,[32] which addressed the scope of preemption under Section 5(b). After the Court's decision in *Good*, Philip Morris did not pursue its summary judgment motion on the basis of federal preemption, agreeing that preemption was not available "to the extent that [P]laintiff's claims mirror those in *Good*."[33]

---

[32] 555 U.S. 70 (2008).
[33] Def.'s Opening Br. Support Mot. Summ. J. 4.

After Plaintiff filed her Motion for Class Certification, however, Philip Morris renewed its federal preemption argument, asserting: Plaintiff's theory of the case had "drastically change[d]"[34] because she no longer was relying on Philip Morris's affirmative misrepresentations, but instead was relying on a theory that Philip Morris concealed, suppressed, or omitted the material fact "that the increased filter ventilation in Marlboro Lights make them potentially more dangerous than regular cigarettes."[35] According to Philip Morris, this distinction is material because, under *Good*, Section 5(b) preempts fraudulent concealment claims, but not fraudulent misrepresentation claims. Plaintiff resists this characterization of *Good* and its related cases, urging that the relevant analysis is whether the state law on which the claim is based "constitutes a 'requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion.'"[36]

## B. Federal Preemption: an Overview

Under the Supremacy clause of the United States Constitution, state law is preempted by federal law when (1) Congress expresses a clear intent to preempt state law in enacting a federal statute, or (2) Congress intends, through comprehensive legislation, to occupy an entire field of regulation and has left no

---

[34] *Id.*

[35] Pl.'s Opening Br. Support Mot. Class Cert. 22.

[36] Pl.'s Resp. Br. Opp. Mot. Summ. J. 4-5 (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 523-24 (1992)).

room for the states to supplement federal law.[37] Here, the parties agree Congress expressly intended the Labeling Act to preempt state law. The question, quite simply, is the scope of that preemption.

In resolving that question, the Court must be guided by the principle that there is a presumption against preemption. To avoid "unintended encroachment" on a state's authority, "a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is 'the clear and manifest purpose of Congress.'"[38] Because of this presumption against preemption, this Court must "fairly but . . . narrowly" construe the language in Section 5(b).[39] The defendant bears the burden of demonstrating preemption,[40] and congressional intent is the "ultimate touchstone" of the analysis.[41]

### C. The United States Supreme Court's Interpretation of Section 5(b)

In construing Section 5(b), I am bound by the United States Supreme Court's interpretation of the clause. That Court has interpreted Section 5(b) on two

---

[37] *O'Malley v. Boris*, 742 A.2d 845, 848 (Del. 1999) (citing *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699 (1984)).

[38] *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663-64 (1993) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005).

[39] *Cipollone*, 505 U.S. at 523.

[40] *Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 192 (Minn. Ct. App. Dec. 4, 2007).

[41] *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96 (1992).

relevant occasions: *Cipollone v. Liggett Group, Inc.*[42] and *Altria Group, Inc. v. Good.*[43] In *Cipollone*, the named plaintiff alleged she developed lung cancer as a result of smoking cigarettes.[44] She brought a series of claims against the defendants, including that the defendants: (1) failed to provide adequate warnings about the health consequences of smoking (the "failure to warn claims"), (2) neutralized, through their advertisements, the federally mandated warning labels on cigarettes (the "neutralization claims"), (3) possessed, but "ignored and failed to act upon" medical and scientific data indicating cigarettes were hazardous to consumers' health, and (4) conspired to defraud by depriving the public of that medical and scientific data.[45] The defendants contended the Labeling Act preempted all those claims.

A plurality of the Supreme Court concluded some, but not all, of the claims were preempted. First, the plurality rejected the plaintiff's argument that Section 5(b) did not preempt common law claims and instead only applied to statutory enactments. The Court reasoned that the phrase "no requirement or prohibition" in

---

[42] 505 U.S. 504 (1992).

[43] 555 U.S. 70 (2008). The Supreme Court also addressed Section 5(b) in *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001). In *Reilly*, the Court concluded Section 5(b) preempted state regulations that sought to restrict the location of cigarette advertisements. The Court later explained that *Reilly* did not alter its analysis in *Cipollone* and that *Reilly* is consistent with *Cipollone* because the regulations in *Reilly* were targeted regulations intended to restrict cigarette advertisements in certain locations, rather than general zoning regulations applicable to all advertisements. *See Good*, 555 U.S. at 83-84.

[44] *Cipollone*, 505 U.S. 504.

[45] *Id.* at 509-10.

Section 5(b) "sweeps broadly and suggests no distinction between positive enactments and common law."[46] The plurality concluded, however, that not all common law actions were preempted and that no "familiar subdivision of common-law claims" were subject to, or escaped from, preemption. Rather, the plurality identified the "central inquiry" as the nature of the predicate duty on which each claim is based:

> [W]e ask whether the legal duty that is the predicate of the common-law damages action constitutes a "requirement or prohibition based on smoking and health . . . imposed under State law with respect to . . . advertising or promotion," giving that clause a fair but narrow reading.[47]

Applying this "predicate duty" analysis to the claims at issue in *Cipollone*, the plurality concluded the plaintiff's failure to warn and neutralization claims were preempted by Section 5(b) to the extent those claims were based on a statutory or common law requirement or prohibition with respect to advertising or promotion. The plurality explained that, to the extent the plaintiff's claims would require the defendants to provide additional or clearer warnings, those claims were preempted, but the claims were not preempted to the extent they relied on the defendants' testing or research practices, or other actions unrelated to advertising or promotion.[48]

---

[46] *Id.* at 521.
[47] *Id.* at 523-24.
[48] *Id.* at 524-25, 527-28.

As to the plaintiff's fraud claims, which included claims that the defendants both falsely represented and concealed material facts, the plurality reasoned those claims largely were not preempted because the predicate duty was a general duty not to deceive, not one based on "smoking and health." The plurality similarly concluded the plaintiff's conspiracy to defraud claims were not preempted. The plurality explained:

> Section 5(b) pre-empts only the imposition of state-law obligations "with respect to the advertising or promotion" of cigarettes. Petitioner's claims that respondents concealed material facts are therefore not pre-empted insofar as those claims rely on a state-law duty to disclose such facts through channels of communication other than advertising or promotion. Thus, for example, if state law obliged respondents to disclose material facts about smoking and health to an administrative agency, § 5(b) would not pre-empt a state-law claim based on a failure to fulfill that obligation.
>
> Moreover, petitioner's fraudulent-misrepresentation claims that do arise with respect to advertising and promotions (most notably claims based on allegedly false statements of material fact made in advertisements) are not pre-empted by § 5(b). Such claims are predicated not on a duty "based on smoking and health" but rather on a more general obligation the duty not to deceive. This understanding of fraud by intentional misstatement is appropriate for several reasons. First, in the 1969 Act, Congress offered no sign that it wished to insulate cigarette manufacturers from longstanding rules governing fraud. To the contrary, both the 1965 and the 1969 Acts explicitly reserved the FTC's authority to identify and punish deceptive advertising practices—an authority that the FTC had long exercised and continues to exercise. See § 5(c) of the 1965 Act; § 7(b) of the 1969 Act; see also nn. 7, 9, *supra. This indicates that Congress intended the phrase "relating to smoking and health" (which was*

*essentially unchanged by the 1969 Act) to be construed narrowly, so as not to proscribe the regulation of deceptive advertising.*[49]

Philip Morris reads this *Cipollone* passage narrowly, arguing the Court concluded that fraudulent *concealment* claims, such as those alleged by Plaintiff in this case, are preempted unless they "rely on a state-law duty to disclose such facts through channels of communication other than advertising or promotion." In contrast, Philip Morris contends, affirmative *misrepresentations* contained in advertisements or promotions are not preempted under *Cipollone*.

In the wake of *Cipollone*, courts applying the plurality's opinion and the "predicate duty" standard diverged on whether Section 5(b) preempted fraudulent concealment claims.[50] Many courts, at least implicitly, rejected the interpretation of the case that Philip Morris urges here. For example, in *Shepard v. Philip Morris, Inc.*, the United States District Court for the Middle District of Florida, applying *Cipollone*, concluded that the plaintiffs' fraudulent concealment claims were not preempted by Section 5(b) because those claims were based on a duty not to deceive and were distinct from failure to warn claims, which were preempted.[51] The Court of Appeals of Minnesota reached a similar conclusion in *Dahl v. R.J.*

---

[49] *Id.* at 528-29 (emphasis added).

[50] *See, e.g. Shepard v. Philip Morris, Inc.*, 1998 WL 34064515, at *3 (M.D. Fla. Apr. 28, 1998) (citing cases demonstrating split among federal courts regarding fraudulent concealment claims); *see also Dahl*, 742 N.W.2d at 194 (noting a split among the federal circuit Courts of Appeal as to whether fraud claims surrounding use of the terms "light" or "low tar" in cigarette advertising are preempted by Section 5(b)).

[51] *Shepard*, 1998 WL 34062515.

*Reynolds Tobacco Co.*, holding that the plaintiffs' fraudulent concealment claims were not preempted under Section 5(b) and *Cipollone*.[52] Similarly, the Sixth Circuit Court of Appeals in *Glassner v. R.J. Reynolds Tobacco Co.* held that the plaintiff's claims for misrepresentation and concealment were preempted to the extent they were based on a duty to issue clearer or additional warnings, but not to the extent they were based on a general "duty not to deceive."[53]

Other courts disagreed, however, and this split among the circuits[54] prompted the Supreme Court in *Good* to again address the scope of Section 5(b).[55] The plaintiffs in *Good* brought claims against tobacco companies that sold "light" or "low-yield" cigarettes, alleging claims for fraudulent misrepresentation and concealment on the basis, among other things, that: "'Light' cigarettes are in fact more harmful because . . . their unique design features produce[] smoke that is more mutagenic per milligram of tar than the smoke of regular cigarettes."[56] A majority of the Supreme Court adopted *Cipollone* as the correct interpretation of Section 5(b) and held that *Cipollone* was "directly applicable" to the plaintiffs' fraud claims.[57] The *Good* Court held that the plaintiffs' fraud claims alleged a

---

[52] 742 N.W.2d at 194.
[53] 223 F.3d 343, 349 (6th Cir. 2000).
[54] *See, e.g. Brown v. Brown & Williamson Tobacco Corp.*, 479 F.3d 383, 392-93 (5th Cir. 2007).
[55] *Good*, 555 U.S. 70.
[56] *Id.* at 72-74.
[57] *Id.* at 74.

21

breach of the duty not to deceive and therefore were not preempted.[58] The Court explained that the Maine Unfair Trade Practices Act, under which the plaintiffs' fraud claims arose, said nothing about smoking or health and therefore was "a general rule that creates a duty not to deceive," rather than a rule respecting smoking or health.[59]

Following *Good*, a lack of uniformity remains among courts that have considered whether fraudulent concealment claims are preempted by Section 5(b). In *Pooshs v. Phillip Morris USA, Inc.*, the United States District Court for the Northern District of California held that the plaintiff's claims for fraudulent concealment were preempted to the extent they were based on statements in advertisements or promotions because such claims were "indistinguishable" from a failure to warn claim.[60] The Supreme Court of Appeals of West Virginia reached a similar conclusion in *In re Tobacco Litigation*, holding that the plaintiffs' fraudulent concealment claims were preempted under Section 5(b) because those claims alleged the defendants should have disclosed concealed information through advertisements and promotions.[61] Both the *Pooshs* and *In re Tobacco Litigation* courts adopted the narrow reading of *Cipollone* advanced by Philip Morris in this

---

[58] *Id.* at 82.
[59] *Id.* at 84.
[60] 2014 WL 6789886, at *15-16 (N.D. Cal. Dec. 2, 2014).
[61] 2014 WL 5545853, at *7 (W. Va. 2014).

22

case, namely that fraudulent concealment claims only escape preemption if they "allege concealment in some channel *other than* advertising or promotion."[62]

Other courts, however, have held that fraudulent concealment claims are not preempted. In *Grill v. Philip Morris USA, Inc.*, the United States District Court for the Southern District of New York held that the plaintiff's fraudulent concealment claims were not preempted, among other reasons, because they were "not predicated on a duty based on smoking and health, but rather on the more general duty not to deceive."[63] In the similarly named, but unrelated case *Grills v. Philip Morris USA, Inc.*, the United States District Court for the Middle District of Florida held that the plaintiff's claims that the defendants "deliberately concealed material facts from the public" were similar to those in *Cipollone* and *Good* and were not preempted even to the extent they were based on allegedly false statements in advertisements.[64] In both cases, the district courts rejected a narrow reading of *Cipollone*, focusing on the predicate duty analysis, rather than on whether the misrepresentation or concealment stemmed from an advertisement or promotion.[65]

These cases form the landscape from which this Court must determine whether Section 5(b) preempts Plaintiff's claims that Philip Morris violated the

---

[62] *In re Tobacco Litig.*, 2014 WL 5545853, at *7 (W. Va. 2014) (citing *Cipollone*, 505 U.S. at 528); *see also Pooshs*, WL 6789886, at *15-16 (N.D. Cal. Dec. 2, 2014).
[63] 653 F. Supp. 2d 481, 491 (S.D. N.Y. 2009).
[64] 645 F. Supp. 2d 1107, 1118 (M.D. Fla. 2009).
[65] *See id.* at 1118-19; *Grill*, 653 F. Supp. 2d at 491-92.

DCFA and unjustly was enriched by fraudulently concealing the truth about the health risks associated with Marlboro Lights.

### D. Plaintiff's Claims are Not Preempted.

As the United States Supreme Court itself has acknowledged, the standard announced in *Cipollone* and adopted by the majority in *Good* lacks a degree of "theoretical elegance."[66] In my view, however, the predicate duty standard, as applied by the Court in *Cipollone* and *Good*, lends itself only to one conclusion: Plaintiff's claims are not preempted.

It reasonably cannot be argued that the DCFA is a "requirement or prohibition" based on "smoking and health." To the contrary, it is a codification of a general duty not to deceive consumers and applies to all manufacturers and sellers of any product. Philip Morris argues, however, that this Court should draw a distinction similar to that drawn in *Pooshs* and *In re Tobacco Litigation*, namely that although fraudulent misrepresentations may not be preempted, claims for fraudulent concealment cannot be distinguished from failure to warn claims and therefore are preempted.

That argument, however, is inconsistent with *Cipollone* and *Good*. With all respect for the courts in *Pooshs* and *In re Tobacco Litigation*, I believe their reading of *Cipollone* is too narrow and cannot be reconciled with the "predicate

---

[66] *Good*, 555 U.S. at 84.

24

duty" standard developed by the *Cipollone* plurality and adopted in *Good*. To focus narrowly on whether the concealment or misrepresentation occurred in an advertisement or promotion is to ignore the limitation in Section 5(b) regarding whether the requirement or prohibition relates to smoking or health. Moreover, the fact that fraudulent concealment claims often could be pleaded as failure to warn claims does not, as the *Pooshs* and *In re Tobacco Litigation* courts seem to conclude, support a conclusion that the concealment claims are preempted. The Supreme Court in *Good* expressly acknowledged this possibility, but concluded it was immaterial to the preemption analysis.[67]

The conclusion Philip Morris urges also draws an artificial distinction between fraudulent concealment and fraudulent misrepresentation claims. In the context of cases such as this, identifying a clear line between a claim of fraudulent misrepresentation and one of concealment nearly is impossible. Perhaps for that reason, the *Cipollone* plurality addressed those claims as one, concluding they were not preempted. The DCFA draws no distinction between affirmative misrepresentations and fraudulent concealment, but instead designates both as violations of state law. The "slight" distinction between concealment and

---

[67] *Id.* at 82 n.9 ("[R]espondents' allegations regarding petitioners' use of the statements 'light' and 'lowered tar and nicotine' could also support a warning neutralization claim. But respondents did not bring such a claim, and the fact that they could have does not, as petitioners suggest, elevate form over substance. There is nothing new in the recognition that the same conduct might violate multiple proscriptions.").

misrepresentation previously has been acknowledged by this Court.[68] Drawing a distinction between misrepresentation and concealment for purposes of delineating the scope of preemption under Section 5(b) is both inconsistent with Supreme Court precedent and unworkable in practice.

Applying the predicate duty analysis to this case, both the concealment claims and the misrepresentation claims at issue arise from a duty not to deceive. Those claims therefore are not preempted. For all the foregoing reasons, Philip Morris's Motion for Summary Judgment is **DENIED**.

## II. Plaintiff's Motion for Class Certification

Having concluded Plaintiff's claims are not preempted, this Court must determine whether this case may proceed as a class action. Plaintiff has moved to certify the class under Superior Court Civil Rule 23. The parties do not dispute the applicable rule and its interpretation as a general matter, though they vigorously dispute its application in this case. Rule 23 provides, in pertinent part:

Rule 23. Class actions.

(a) *Requisites to class action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is

---

[68] *Wolstenholme v. Hygienic Exterminating Co.*, 1988 WL 90575, at *3 (Del. Super. Aug. 19, 1988) ("[T]he difference between fraudulent misrepresentation and fraudulent concealment based upon a representation is slight indeed."); *Lock v. Schreppler*, 426 A.2d 856, 859 (Del. Super. 1981) (noting the "minor differences" between fraudulent misrepresentation and fraudulent concealment); *see also Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983) ("[F]raud does not consist merely of overt misrepresentations. It may also occur through deliberate concealment of material facts . . . .").

impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

> (b) *Class actions maintainable.* An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:

*     *     *

> (3) The Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Thus, consideration of a motion for class certification under Rule 23 requires a two-step analysis. First, the Court must determine that all four elements of Rule 23(a) are satisfied, namely: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy.[69] If the requirements of subsection (a) are met, the Court then must determine whether one of the "disjunctive requirements" of subsection (b) is met.[70] Plaintiff contends this case meets the requirements of subsection (b)(3) because common questions of fact and law predominate over individual questions and a class action would be a superior means of adjudicating the controversy.

In reaching its determination regarding whether a case meets the prerequisites of Rule 23, this Court must engage in a "rigorous analysis," rather

---

[69] *Wit Capital Grp., Inc. v. Benning*, 897 A.2d 172, 178 (Del. 2006).
[70] *Id.* at 179.

than relying solely on the parties' pleadings.[71] The plaintiff bears the burden of establishing that all the elements of the rule are satisfied.[72]

## A. The Parties' Contentions

Plaintiff contends the elements of Rule 23(a) are met, pointing out that the following common questions of law and fact "should ultimately be determinative of the outcome of this action:" (1) whether Philip Morris violated the DCFA by "concealing, suppressing[,] and/or omitting the material fact . . . that the increased filter ventilation in Marlboro Lights made Marlboro Lights potentially more dangerous than regular cigarettes"; (2) whether Philip Morris's violation of the DCFA caused the members of the class to sustain economic damages; and (3) whether Philip Morris's conduct warrants imposing punitive damages.[73] Plaintiff further contends her claims are typical of the claims of the class because they "arise from [Philip Morris's] same course of conduct and are based on the same legal theory as the claims of all other class members." She argues she adequately can represent the class because her attorneys are experienced in class actions

---

[71] *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).

[72] *Garrett v. Zon Capital P'rs, L.P*, 2011 WL 5579112, at *2 (Del. Ch. Nov. 10, 2011). There does not appear to be any case law in Delaware defining the burden of proof a plaintiff bears in establishing any facts necessary to a class certification determination. According to a treatise on class actions, most federal courts are moving toward adopting a preponderance of the evidence standard. William B. Rubenstein, *Newberg on Class Actions* § 7:21 (5th ed. 2016). The Third Circuit expressly adopted that standard in *In re Hydrogen Peroxide*, 552 F.3d 305, 309 (3d Cir. 2008). Because I base my decision on undisputed facts, whether preponderance of the evidence is the appropriate standard under Rule 23 is not material to my resolution of Plaintiff's Motion.

[73] Pl.'s Opening Br. Support Mot. Class Cert. 22 (quoting Second Am. Compl. ¶¶39-40).

generally and tobacco litigation particularly and because her interests are aligned with all other class members.

As to Rule 23(b)(3), Plaintiff contends the common issues identified above will predominate over any individual issues. Plaintiff urges that resolving these claims through a class action would be significantly more efficient than adjudicating a multitude of individual actions and that class certification may be the only means by which these claims can be advanced because the potential recovery of any one class member would not justify maintaining an action. Finally, Plaintiff argues this case is distinct from actions in other jurisdictions that have denied class certification because those cases were premised on a contention that a tobacco company fraudulently *misrepresented* that a low-yield cigarette was *less* dangerous than a full-flavored cigarette, while this case asserts a claim that Philip Morris fraudulently *concealed* that Marlboro Lights potentially are *more* dangerous than a full-flavored cigarette.

Philip Morris responds that a class cannot be certified in this case because "[i]nherently individual issues concerning causation, injury, damages, class membership, and affirmative defenses would remain for each class member."[74] Philip Morris argues each class member individually would need to prove causation because the Court cannot infer reliance by the class given the variable

---

[74] Def.'s Opp'n Mot. Class Cert. 22.

29

reasons consumers choose a particular brand or type of cigarette. Philip Morris similarly argues that individual proof would be necessary to establish fact of injury for each class member because even Plaintiff concedes Marlboro Lights are not more dangerous for all consumers and receiving a cigarette that "potentially" is more dangerous is not actual injury. Philip Morris also contends Plaintiff cannot prove out-of-pocket loss on a class-wide basis because the evidence Plaintiff offers, namely Dr. Goldberg's expert opinion, does not establish class-wide loss.

Finally, although it was not the focus of the parties' briefs or arguments, Philip Morris asserts the Motion for Class Certification should not be granted because: (i) would-be class members would need to offer individual proofs to establish membership in the class; (ii) Philip Morris's affirmative defenses require individual proofs as to each class member; (iii) the amount of damages suffered by each class member could require mini-trials for each individual; (iv) class action is not a superior means of resolving these claims; and (v) Plaintiff's claims are not typical of the class, and she is not an adequate representative.

The only Rule 23 element Philip Morris does not dispute is numerosity, *i.e.*, that the class is so numerous that joinder of all its members would be impracticable. The focus of the parties' arguments and my analysis is on the elements of commonality and predominance with respect to causation and fact of injury.

30

## B. Commonality and Predominance Generally

The element of commonality under Rule 23(a) and the requirement for predominance of common issues under Rule 23(b) require a similar, though distinct analysis. The elements often are analyzed together, with particular focus on predominance.[75] To meet the requirement of commonality, Plaintiff must establish that "there are questions of law or fact common to the class."[76] That element, however, does not merely mean that the class claims involve one or more common questions or that the class members all suffered a violation of the same law.[77] Rather, the class members' claims must be based on "a common contention . . . that is capable of classwide resolution–which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[78] Raising a common question is not enough to satisfy commonality; a plaintiff must establish that a class action could "generate common *answers* apt to drive the resolution of the litigation."[79]

---

[75] *Johnson v. GEICO Cas. Co. (Johnson I)*, 673 F. Supp. 2d. 255, 272 (D. Del. 2009) (citing *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004)).

[76] Super. Ct. Civ. R. 23(a)(2).

[77] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011). Although not binding, cases interpreting Fed. R. Civ. P. 23 are persuasive because the federal rule virtually is identical to the Superior Court rule. *See Nottingham P'rs v. Dana*, 564 A.2d 1089, 1094 (Del. 1989) (citing *Hoffman v. Cohen*, 538 A.2d 1096, 1097 (Del. 1988) ("In those instances where our present rule is exactly the same as the Federal rule, it is desirable to follow the interpretation placed upon it by the Federal Courts, especially where those Courts have been so nearly unanimous in their rulings, unless some good reason appears for adopting a contrary construction.")).

[78] *Dukes*, 564 U.S. 338 at 350.

[79] *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-132 (2009)).

The requirement in Rule 23(b)(3) for common issues to predominate over individual issues is similar to the question of commonality, but "much more demanding."[80] Predominance requires a finding that issues common to the class dominate individual issues. The element is not met where the "essential elements of the cause of action require[] individual treatment."[81] In determining whether an element will be resolved through individual or common treatment, the Court must consider the nature of the evidence that will resolve the issue.[82]

## C. Causation

Philip Morris argues that, even if Plaintiff can establish the company fraudulently concealed information from the class, the question of causation will require individual treatment and precludes a finding of commonality or predominance. Plaintiff brings two claims against Philip Morris: one for allegedly violating the DCFA and one for unjustly enriching itself. The DCFA provides, in pertinent part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or

[80] *Smith v. Hercules*, 2003 WL 1580603, at *10 (Del. Super. Jan. 31, 2003) (citations omitted).
[81] *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001) (citation omitted).
[82] *Yarger v. ING Bank, FSB*, 285 F.R.D. 308, 321 (D. Del. 2012).

not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.[83]

Plaintiff claims Philip Morris concealed information regarding the mutagenicity of tar in Marlboro Lights and that the class suffered economic harm as a result of this conduct. Plaintiff similarly alleges Philip Morris unjustly was enriched by its fraudulent concealment. Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[84] To prevail in a claim for unjust enrichment, Plaintiff must prove: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.[85]

Plaintiff concedes causation is an essential element of both her claims.[86] She contends she can establish causation through a class-wide inference, which she

---

[83] 6 *Del. C.* § 2513(a). A private cause of action exists under the statute. *Young v. Joyce*, 351 A.2d 857 (Del. 1975); 6 *Del. C.* § 2525.

[84] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (citing 66 Am. Jur. 2d *Restitution & Implied Contracts* § 3, at 945 (1973)).

[85] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010).

[86] *Carroll v. Philip Morris USA, Inc.*, C.A. No. 03C-08-167 AML, at 31:4-12 (Del. Super. Dec. 9, 2016) (TRANSCRIPT) (hereinafter "Tr."); *see also Stephenson*, 462 A.3d at 1077 ("A plaintiff . . . may recover for any injury resulting from the direct and natural consequences of his acting on the strength of the defendant's statement."); *Crowell Corp. v. Himont USA, Inc.*, 1994 WL 762663, at *4 (Del. Super. Dec. 8, 1994) ("Under the [DCFA], all damages proximately caused by and naturally flowing from a violation of the Act are recoverable."); *Republic of Panama v. Am. Tobacco Co.*, 2006 WL 1933740, at *8 (acknowledging that proximate cause typically is not an element of unjust enrichment, but finding that "in the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim" and that an unjust enrichment claim must fail when there is no proof of causation for the tort claim); *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 518-19 (7th Cir. 2011) (holding that a plaintiff advancing an unjust enrichment claim must show a detriment and "significantly, a connection between the

argues this Court may draw from the logical syllogism that no one knowingly would buy or consume a more dangerous cigarette.[87] In addition to pure logic, Plaintiff relies on Dr. Goldberg, who opines in his report that the Marlboro Lights brand would have been "completely unmarketable and valueless from its inception had Philip Morris not concealed that Marlboro Lights were potentially more dangerous than regular cigarettes."[88] Relying on Dr. Goldberg and logic, Plaintiff argues that, had Philip Morris not concealed information regarding the potential increased risk posed by the mutagenicity of the tar in Marlboro Lights, the company never would have marketed the product in the first place and no member of the class would have purchased those particular light cigarettes.

In my view, Plaintiff is not entitled to a class-wide inference of causation for a number of reasons, namely because (1) a consumer's reason for choosing to smoke a particular brand varies widely and is not based exclusively, or even predominantly, on health considerations; (2) Dr. Goldberg's opinion does not support a conclusion that no market for Marlboro Lights would have been created

---

detriment and the defendant's retention of the benefit" and concluding that the plaintiff consumers could not pursue an unjust enrichment claim without evidence that they would have acted differently if the defendants had not concealed information regarding cigarettes).

[87] It is important to note that a consumer need not prove reliance on fraudulent omissions or misrepresentations in order to sustain a claim under the DCFA. 6 *Del. C.* § 2513; *Warfarin*, 391 F.3d at 528-29. It is settled, however, and Plaintiff does not dispute, that she must establish a causal relationship between the omissions or misrepresentations and the injuries to the class. *See* 6 *Del. C.* § 2525; *Johnson v. GEICO Cas. Co. (Johnson II)*, 310 F.R.D. 246, 253 (D. Del. 2015). At various times, particularly during oral argument, the parties used language that appeared to conflate reliance and causation. I avoid the term reliance here because it is not a required element of Plaintiff's claim, but rather the manner by which Plaintiff seeks to prove causation.

[88] Goldberg Rep. 22.

34

had the fraudulent omissions not occurred; and (3) the record does not support the

logical syllogism Plaintiff proffers.

First, courts generally decline to infer class-wide causation in consumer

fraud cases.[89] The reasoning, perhaps, is obvious: unlike securities fraud actions,

where a "fraud-on-the-market" inference often in drawn, the sheer variability in the

reasons people engage in a consumer transaction makes a class-wide inference

inadvisable.[90] Apart from consumer transactions in which there only is one reason

a consumer would purchase the product in question, or select one brand or product

over another, individual issues of causation typically preclude any finding that

common issues predominate in consumer class actions.[91] As the Oregon Supreme

---

[89] *See, e.g. Yarger*, 285 F.R.D. at 327-28 (citing *Aubrey v. Sanders*, 346 F. App'x 847, 849-50 (3d Cir. 2009) (rejecting application of fraud-on-the-market theory for common law fraud claims); *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 474 (Del. 1992) (stating that fraud-on-the-market presumption of reliance is not available in common law fraud actions and that "A class action may not be maintained in a purely common law fraud case since individual questions of law or fact, particularly as to the element of justifiable reliance, will inevitably predominate over common questions of law or fact"); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008) (refusing to apply "presumption of reliance" in putative class action where defendants had conducted "national marketing campaign," noting that "reliance on the misrepresentation [ ] cannot be the subject of general proof"); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir.1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue."); *In re Neurontin Mktg., Sales Practices & Prods. Liab. Litig.*, 257 F.R.D. 315, 326 (D. Mass. 2009) (discussing "courts' general unwillingness to permit a presumption of reliance/causation in consumer fraud cases")).

[90] *See Yarger*, 285 F.R.D. at 327-328; *Poulos v. Caesars World, Inc.*, 379 F.3d 654 (9th Cir. 2004); *Cohen v. Implant Innovactions, Inc.*, 259 F.R.D. 617, 628 (S.D. Fla. 2008); *Pearson v. Philip Morris, Inc.*, 361 P.3d 3, 31 (Or. 2015); *Stern v. Philip Morris USA, Inc.*, 2007 WL 4841057 (N.J. Super. Ct. Nov. 16, 2007) (App'x Unreported Opinions Cited Pl.'s Reply Br. Support Mot. Class Cert., Ex. 10).

[91] *Compare Warfarin*, 391 F.3d 516 (finding that causation could be determined on a class-wide basis in a case involving a generic pharmaceutical product that was the bioequivalent and therapeutic equivalent of the brand name product), *with Marcus v. BMW of N. Am., LLC*, 687

Court recently explained in another case involving Marlboro Lights, a class-wide inference cannot be drawn where it would require a large number of consumers to have the same subjective state of mind:

> For at least some commodities, the only logical explanation for a consumer's purchase may be that the product has–or is represented to have–an essential quality, without which it would be worthless. . . . This is not that kind of case. Rather, this is a more typical consumer transaction, one that involves consumer choices that implicate states of mind, perceptions, beliefs, and conscious and subconscious motivations.[92]

The record in this case supports the conclusion that smokers select a particular type or brand of cigarette for a variety of reasons, and that health-related reasons are not even the predominant force driving a consumer's choice. The testimony offered by putative class representatives in other cases involving low-yield cigarettes, as well as market surveys, indicate that consumers select brands and types of cigarettes for reasons such as taste, peer-influence, perceived health benefits, and the cigarette's delivery. Decisions in other jurisdictions have reached

---

F.3d 583 (3d Cir. 2012) (finding no inference of causation could be drawn in a case contending the defendant fraudulently misrepresented and omitted material information regarding run-flat tires). In support of her inference of causation argument here, Plaintiff relied in part on the District of Delaware's decision in *Johnson I*, 673 F. Supp. 2d 255, in which the District Court of Delaware concluded that predominance and commonality were met in a consumer fraud case under the DCFA. *Johnson I* is distinguishable on two independent grounds. First, the class later was decertified by the court because, among other reasons, individual issues regarding loss causation precluded a finding of predominance. *Johnson II*, 310 F.R.D. at 253. Second, as the District Court's decertification decision points out, the original decision certifying the class relied on a mistaken conclusion that causation was not a necessary element of proof under the DCFA. *See Johnson I*, 673 F. Supp. 2d. at 276 n.14; *Johnson II*, 310 F.R.D. at 253.

[92] *Pearson*, 361 P.3d at 31.

a similar conclusion in cases involving motions to certify a class in a challenge to misrepresentations regarding low-yield cigarettes.[93]

The second reason Plaintiff is not entitled to an inference of causation is that Dr. Goldberg's report does not, as Plaintiff contends, support the inference. Even if I assume Dr. Goldberg's report is admissible, notwithstanding Philip Morris's Motion to Strike, the report does not sustain the conclusion that Philip Morris could not have marketed Marlboro Lights but for the fraudulent omissions. Marlboro Lights were introduced into the market in 1971. Plaintiff conceded at oral argument that Philip Morris had knowledge in the mid-1970s, at the earliest, that the mutagenicity in the tar of Marlboro Lights made them potentially more dangerous than Marlboro Reds.[94] By then, the market for Marlboro Lights already existed. What would have happened to that market if Philip Morris had made public its research about mutagenicity is another question altogether, but not one that Dr. Goldberg's opinion squarely addresses, at least not to the point that this Court may draw an inference that the market immediately would have ceased buying Marlboro Lights.

---

[93] *See, e.g. McLaughlin v. Am. Tobacco Co.*, 522 F.3d. 215, 225-26 (2d Cir. 2008); *Pearson*, 361 P.3d at 31; *Davies v. Philip Morris U.S.A., Inc.*, 2006 WL 1600067, at *3 (Wash. Super. Ct. May 26, 2006). Plaintiff argues these cases are distinguishable because they challenged representations that low-yield cigarettes are *less* dangerous than full-flavored cigarettes, rather than omissions that low-yield cigarettes potentially are *more* dangerous than full-flavored cigarettes. As explained below, that distinction does not support the logical inference Plaintiff urges upon the Court.

[94] Tr. 17.

Third, and relatedly, Plaintiff is not entitled to an inference of causation because the remainder of the record does not support the logical conclusion Plaintiff advances. Although there is facial appeal to Plaintiff's argument that no rational person knowingly would purchase a more dangerous cigarette, the record demonstrates otherwise. For decades, consumers were told that full-flavored cigarettes were more dangerous than low-yield cigarettes, but many consumers continued to buy full-flavored cigarettes, including Marlboro Reds. Plaintiff attempts to dismiss this evidence by arguing the risk posed by Marlboro Reds (the amount of tar) is different than the potential risk posed by Marlboro Lights (the mutagenicity of the tar) and therefore the history of Marlboro Reds is not relevant.[95] That argument, however, misses the point: the history regarding Marlboro Reds defeats Plaintiff's "rational consumer" argument and confirms that consumers' cigarette choices are based on multiple factors. The reason why Marlboro Reds were perceived to be more dangerous, or potentially more dangerous, than Marlboro Lights does not lessen the relevance of this evidence to Plaintiff's rational consumer argument. As the Oregon Supreme Court succinctly put it:

> [S]moking is in many ways an irrational choice. When a consumer's choice to engage in activity or buy a product involves irrational motivations, it is all but patent that individual inquiries will be required to determine why the

---

[95] *See* Pl.'s Reply Br. Support Mot. Class Cert. 26.

individual members of a large class make the choices they make.[96]

Finally, even if Plaintiff was entitled to a class-wide presumption of causation, that presumption is rebuttable. Philip Morris would be entitled to present evidence that losses suffered by members of the class were not causally linked to the alleged fraudulent concealment (that is, that individual class members did not choose Marlboro Lights for health reasons). That defense itself would present individual issues that would predominate over the common issues Plaintiff identifies.[97]

Accordingly, although Plaintiff has identified certain issues susceptible of common proof – such as Philip Morris's knowledge and alleged concealment, as well as the issue of whether Marlboro Lights potentially are more mutagenic than regular cigarettes – individual issues regarding causation (and fact of injury, as discussed below) preclude any finding that the common issues predominate over individual issues.

### D. Fact of Injury

In addition to causation, Plaintiff also must prove actual loss, or "fact of injury," in order to sustain her claims for violation of the DCFA and unjust

---

[96] *Pearson*, 361 P.3d at 31.

[97] *Davies*, 2006 WL 1600067, at *3 (finding that, even if the plaintiffs were entitled to a presumption of causation, the presumption was rebuttable and the defendant would be entitled to challenge "each and every class member as to his or her reasons for buying light cigarettes," thereby defeating any finding of commonality or predominance).

enrichment.[98] Although the need for individual proof regarding the *amount* of damages ordinarily will not defeat class certification, the *fact* of injury is an element of liability and the need for individual proof of that element may preclude any finding of predominance.[99] "Where proof of fact of damages requires evidence concerning individual class members, the common questions of fact become subordinate to the individual issues, thereby rendering class certification problematic."[100]

There are two types of economic harm recognized under Delaware law in cases involving consumer fraud, including claims arising under the DCFA.[101] Here, Plaintiff contends that the class suffered "out-of-pocket" damages because the actual value of the Marlboro Lights was less than what members of the putative class paid for them. Plaintiff contends that, but for Philip Morris's fraud, Marlboro Lights would have been worthless and all class members therefore suffered an economic loss by paying for a valueless product.[102] Plaintiff contends that out-of-

---

[98] *See* Pl.'s Opening Br. Support Mot. Class Cert. 32 (acknowledging the need to prove fact of injury for both claims); *Young*, 351 A.2d at 859 ("[T]he individual consumer harmed by a violation of [the DCFA] [is] allowed to recoup any actual losses suffered as a result of fraud or deception practiced against him."); *Nemec*, 991 A.2d at 1130 (holding that impoverishment and a connection between the enrichment and impoverishment are necessary to sustain a claim for unjust enrichment).

[99] *Wit Capital*, 897 A.3d at 179.

[100] *Id.* at 179 (quoting *Hoang v. E\*Trade Grp., Inc.*, 784 N.E.2d 151 (Ohio Ct. App. 2003)).

[101] *Stephenson*, 462 A.3d at 1076 & n.4.

[102] Pl.'s Opening Br. Support Mot. Class Cert. 40-42.

pocket loss is sufficient to establish fact of injury and that Dr. Goldberg's expert report is common proof of such injury.[103]

There are two problems with Plaintiff's contention that fact of injury can be established with common evidence in this case: (1) Plaintiff's claim relies on "potential" harm; and (2) the record does not support a conclusion that Marlboro Lights were valueless. First, the injury Plaintiff asserts is based on her contention that Marlboro Lights "potentially" were more dangerous than full-flavored cigarettes. This "potential" for increased harm, however, is not the same as actual harm. Plaintiff's expert, Dr. Peter Shields, concedes that Marlboro Lights were not more harmful for all consumers.[104] Rather, assuming the tar from Marlboro Lights was in fact more mutagenic than the tar from a full-flavored cigarette, the relative risk of harm to the consumer still depends on the amount of tar the consumer ingested. Those consumers who did not suffer any increased harm did not suffer any economic loss. In other words, similar to the analysis above regarding causation, whether any member of the putative class suffered any injury depends on an analysis of each smoker's behavior and whether they suffered any increased danger by smoking Marlboro Lights. Most other courts that have considered the issue have reached the same conclusion: consumer fraud claims relating to low-

---

[103] *Id.*
[104] Shields Dep. 123, 243.

yield cigarettes are not amenable to class certification because of the need for individualized proof regarding fact of injury.[105]

Plaintiff attempts to circumvent this weakness by arguing that the "potential" increased harm posed by Marlboro Lights is itself the injury. That is, Plaintiff contends Marlboro Lights were valueless because they were more dangerous than full-flavored cigarettes when their sole purpose for being introduced into the market was that they were less dangerous.[106] Plaintiff again relies on "logic" and Dr. Goldberg's opinion that Marlboro Lights never would have been introduced to the market had Philip Morris been forthcoming with its information regarding the mutagenicity of the tar in Marlboro Lights. As set forth above, however, in the discussion regarding causation, this analysis fails because (1) it relies on an assumption regarding smokers' behavior and choices that is not supported and in fact is contradicted by the record; and (2) Dr. Goldberg's opinion is unreliable on the introduction-to-market point.

Put simply, the record does not support the conclusion or inference that a cigarette that may be more dangerous to consumers has no market value; the evidence of Marlboro Reds' steady market share during the decades that full-

---

[105] *See McLaughlin*, 522 F.3d 215; *Lawrence v. Philip Morris USA, Inc.*, 53 A.3d 525 (N.H. 2012); *Philip Morris USA, Inc. v. Hines*, 883 So.2d 292 (Fla. Dist. Ct. App. 2003); *Stern*, 2007 WL 4841057.

[106] To reiterate, Plaintiff's complaint seeks only economic damages; Plaintiff does not seek to recover for personal injury or emotional harm associated with the mutagenicity of Marlboro Lights.

42

flavored cigarettes were described as more dangerous is more than enough proof to defeat any class-wide inference on that point. Instead, individual inquiry will be necessary to determine what each individual consumer would have done had Philip Morris not allegedly concealed information regarding the mutagenicity of the tar in Marlboro Lights.

For the foregoing reasons, I conclude Plaintiff has not met her burden under Rule 23(b)(3) to show that common issues predominate over individual issues and the motion to certify the class therefore is **DENIED**.

### III.   Philip Morris's Motion to Strike

Having denied Plaintiff's Motion for Class Certification, the issue of the admissibility of Dr. Goldberg's report largely is moot. Large portions of Dr. Goldberg's report may be unnecessary in view of my decision on class certification. To the extent consumers, including Plaintiff, pursue individual claims against Philip Morris and retain Dr. Goldberg, the Court then may address his report's admissibility with a more focused understanding of the scope of his opinion and its relation to the issues in each particular case.

### CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is **DENIED**, Plaintiff's Motion for Class Certification is **DENIED**, and Defendant's Motion to Strike is **DENIED as moot.**